## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SHANNON SCHULTE, on behalf of herself and all others similarly situated | ) ) ) | Case No. 1:09-CV-06655 |
| | ) | The Honorable Robert M. Dow, Jr. |
| Plaintiff, | ) ) | |
| -v- | ) ) | |
| FIFTH THIRD BANK | ) ) | |
| Defendant. | ) ) ) | |

## PLAINTIFFS' RESPONSE TO OBJECTIONS OF MICHELLE KEYES, AMANDA RATLIFF, AND VERDEL RATLIFF TO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Plaintiffs Shannon Schulte and Marlene Willard[1] ("Plaintiffs"), individually and on behalf of the Settlement Class (as defined in the Settlement Agreement), by and through Ben Barnow, Barnow and Associates, P.C., and Of Counsel, Burton H. Finkelstein, Finkelstein Thompson LLP, Hassan A. Zavareei, Tycko & Zavareei, LLP and David J. Worley, Evangelista & Associates LLC (collectively "Proposed Settlement Class Counsel"), hereby respond to the pending objection—Objections of Michelle Keyes, Amanda Ratliff, and Verdel Ratliff ("Objectors") to Plaintiffs' Motion for Preliminary Approval of Class Action Settlement.

## INTRODUCTION

Very basic principles are implemented by a motion for preliminary approval of a class action settlement. The first is the need to meet the standard of being within the *range* of fair,

---

[1] Marlene Willard brought a separate lawsuit in the Northern District of Georgia against Defendant Fifth Third Bank, Case No. 1:10-CV-00271. While Plaintiff Willard is not a party to the Illinois action, upon entry of final approval of this settlement, the *Willard* action will be dismissed with prejudice, in the Northern District of Georgia.

1

adequate and reasonable. This is different than, and a lower standard than, the requirement of being finally determined to be fair, adequate and reasonable, as is required for final approval. There are a number of reasons for the difference in the standards. One reason, and an important one, is the opportunity for members of the Settlement Class, whose rights are affected by the proposed settlement, to learn of it and show their view, approval, or disapproval, by a period of comment after the publication and mailing of notice, during which they can each participate in, object, or exclude themselves (opt out) from the settlement. Where a settlement has been negotiated by experienced and recognized class action counsel, as with this one, and where it meets on its face the requirement of being within the range of fair, adequate and reasonable, as does this one, preliminary approval should be granted.

Here, the Court is being encouraged by the Objectors to derail the standard approval and objection process by interests that cannot, by any standard, be equated with the result of a constitutional notice and response process, as class action practice and law require, and as the proposed Settlement Agreement provides. The objections filed here on behalf of these alleged objectors, each of whom would have the right to object as part of the constitutionally required process with any other members of the Settlement Class and have their concerns addressed equally with other Settlement Class Members, seek to derail the rights of Settlement Class Members to be informed and to comment. Somehow, they have come to the conclusion that only they get to vote. The record clearly illustrates that the posed objections are wrong, are against the interests of the Settlement Class, and are the product of continued and repeated attempts of the Objectors' Counsel to control this litigation. Indeed, at oral argument on Objectors' Counsel's petition to the Judicial Panel on Multidistrict Litigation (the "Panel") to centralize all cases against Fifth Third in their Florida MDL, another attempt to stop the settlement that was

2

dispatched without much ado by the Panel, even they admitted that the settlement should go through the objection process. Moreover, the persons listed as objectors here have not complied with the objection procedures required by the Settlement Agreement, thus preventing Proposed Settlement Class Counsel and Plaintiffs from fully testing the origin of the objections and, more importantly, the view of the Settlement Class.

Nevertheless, no matter how these objections are presented to the Court, the fact, as shown below, is that the Settlement Agreement is an excellent one deserving of not only preliminary approval, but, while still needing to go through the constitutionally mandated notice and objection process, ultimately, of final approval. The Settlement Agreement is, without serious question, within the range of fair, adequate and reasonable, as required for preliminary approval.

I.    **THE STANDARD FOR GRANTING PRELIMINARY APPROVAL IS WHETHER THE SETTLEMENT IS WITHIN THE RANGE OF POSSIBLE APPROVAL.**

As Plaintiffs have already noted, for purposes of preliminary approval of a class action settlement, a court should hold a hearing to:

> determine whether the proposed settlement is 'within the range of possible approval.' This hearing is not a fairness hearing; its purpose, rather, is to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing. [citation omitted] If the district court finds a settlement proposal 'within the range of possible approval,' it then proceeds to the second step in the review process, the fairness hearing. Class members are notified of the proposed settlement and of the fairness hearing at which they and all interested parties have an opportunity to be heard.

*Kaufman v. Am. Exp. Travel Related Servs. Co.*, 264 F.R.D. 438, 447 (N.D. Ill. 2009) (quoting

*Armstrong v. v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980),

*overruled on other grounds by Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998)). Under this

standard, the proposed settlement is within the range of possible approval and should be preliminarily approved, notice should be provided to the Settlement Class, and all Settlement Class Members should be afforded the opportunity to be heard.

## II.     THE AMOUNT OF THE SETTLEMENT MEETS THE STANDARD OF FAIR, ADEQUATE AND REASONABLE.

There is no doubt that the amount of the settlement is within the range of being fair, adequate and reasonable.  While not now before the Court, it is in fact, as will be shown at the Final Fairness Hearing as ordered by the Court, fair, adequate, and reasonable.  The Seventh Circuit considers the "most important factor relevant to the fairness of a class action settlement" to be "the strength of plaintiff's case on the merits balanced against the amount offered in the settlement."  *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (citing *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979); Manual for Complex Litigation § 1.46 at 56 (4th ed.1977)).  When evaluating settlements, the Seventh Circuit has acknowledged that courts do not need to set forth conclusions with mathematical precision, nor conduct a trial on the merits.  *See In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d at 1132–33, n.44.  Indeed "a high degree of precision cannot be expected in valuing a litigation, especially regarding the estimation of the probability of particular outcomes."  *Reynolds v. Beneficial Nat. Bank*, 288 F. 3d 277, 285 (7th Cir. 2002).  Instead, all a court needs are ballpark figures from which to derive whether the settlement is within the range of reasonable settlements.  *See Synfuel Techs*, 463 F.3d at 653; *Ledford v. City of Highland Park*, No. 00cv4212, 2000 WL 1053967, at *2 (N.D. Ill. July 31, 2000).  The merits of Plaintiffs' case (not as Plaintiffs would assert them alone, but as they would be challenged),

compared to the results obtained in the Settlement Agreement illustrates the strength of this settlement, and that it is deserving of preliminary approval and, ultimately, final approval.

### A. While Plaintiffs' allegations have merit, litigation uncertainty remains.

Despite the rosy picture painted by the Objectors' and Objectors' Counsel (each of whom have great interest in controlling this litigation), the law at issue in this case is far from settled in a plaintiff class' favor. As the Court is aware from the parties' briefing on Fifth Third's motion to dismiss, the only United States Court of Appeals to address issues similar to those here has issued an opinion unfavorable to Plaintiff's cause. *See Hassler v. Sovereign Bank*, No. 09-2982, 2010 WL 893134 (3d Cir. Mar. 15, 2010). As Fifth Third argues in its motion to dismiss, other courts have rendered opinions unfavorable to Plaintiff's position here. *See, e.g., Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509, 512–13 (D.N.J. 2009); *Hill v. St. Paul Federal Bank for Savings*, 329 Ill. App. 3d 705 (1st Dist. 2002); *Torres v. Wells Fargo*, No. 07cv5561, 2008 WL 2397460, at *1–2 (N.D. Cal. June 11, 2008).

The most recent favorable decision that would support plaintiffs' cause denied motions to dismiss by certain banks in the MDL proceeding. *See In re Checking Acct. Overdraft Litig.*, 09-MD-02036, 2010 WL 841305, at *2 (S.D. Fla. Mar. 11, 2010). While that decision is supported by Plaintiffs here, it should be recognized that the decision was explicitly limited by Judge King to the early proceedings in the case—when he was obligated to accept all of the plaintiffs' allegations as true. Indeed, in that decision, Judge King identifies some of the hurdles in the way of the plaintiffs' ultimate success in the case:

- "Any arguments regarding specific Plaintiffs or specific states may be raised at a later stage upon Court consideration of class certification, summary judgment, or trial."

5

- "Moreover, in *White v. Wachovia*, the court found that good faith was a question of fact to be developed on discovery . . . . Based upon the pleadings before it, the court found that plaintiffs alleged sufficient facts . . . . Although discovery may make clear that the banks complied with its obligations in good faith, Plaintiffs have sufficiently alleged otherwise."

- "Hence, while the law does not permit a party to simultaneously prevail on an unjust enrichment theory and a contractual theory, it does not require the dismissal (at the motion to dismiss stage) . . . . That argument may be properly raised at a later stage in this litigation, such as summary judgment."

*See In re Checking Acct. Overdraft Litig.*, 2010 WL 841305, at *8, 11, 16.

Yet another indicator of the difficulty and uncertainty of Plaintiffs' claims that would be pursued by Fifth Third may be found in the Objectors' reliance on *Gutierrez v. Wells Fargo*, 3:07CV05923 (N.D. Cal.), where the merits of the case were uncertain enough (to both parties) to justify litigation through trial. That uncertainty is further exemplified by the wildly varying estimates of the damages in that case. *See infra*, Section II.B.

**B.     The Amount Available to Settlement Class Members in the Proposed Settlement.**

The comparison of settlements of similar cases is an accepted judicial tool for determining whether a settlement is fair, adequate and reasonable. *See McBean v. City of New York*, 233 F.R.D. 377, 388–91 (S.D.N.Y. 2006); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 643 (E.D. Pa. 2003). The Objectors rely heavily on *Gutierrez* and, as such, a brief analysis of that case is appropriate. The range of damages at issue in *Gutierrez* (which implicates Wells Fargo's allegedly unlawful debit card overdrafts by California consumers) is, by calculation, roughly six (6) to eight (8) times the amount that is potentially at issue in this case.[2] And despite the Objectors' reliance on the *Gutierrez* court's rejection of the settlement in

---

[2] Upon information and belief, that case involved a California-only class; approximately 40% of Wells Fargo's business is derived from California customers. And if the number of deposit accounts of Wells

6

that case, there is no question that the damages are far from certain and a different result should be reached here.

Gutierrez[3] presented an expert report with damages ranging from approximately $69 million to $300 million. Wells Fargo's expert, in contrast, attacked those numbers on the basis that, for example, the damages should not include some of the overdraft fees incurred by people who repeatedly overdraft their accounts because those customers were on notice of Wells Fargo's ordering practices, yet still opted to engage in behavior that resulted in overdraft fees from high to low reordering.[4] Taking this latter variable into consideration, Wells Fargo's expert calculated the damages as ranging between $5 million and $31.5 million—depending on how many overdraft transactions a customer was allowed before being deemed to have notice.

While Plaintiffs do not necessarily agree with Wells Fargo's argument regarding "chronic overdrafters," it is of fair consideration in a proposed settlement of this nature. Even under the principal theory that Fifth Third failed to adequately disclose the policies they used to assess overdraft fees, making it nearly impossible for many reasonable and diligent customers to avoid the imposition of these fees, the argument could be made that at some point, customers are deemed to have either actual or constructive knowledge of the policies. In short, damages estimates must be discounted based on the litigation risk of a total loss and/or a significant reduction in damages based on numerous arguments that Fifth Third will likely make, and has made, regarding the amount of damages. From these competing estimates (and even the wide

---

Fargo and Fifth Third is compared, as illustrated below, then the Wells Fargo class is up to 8 times larger than the Settlement Class here.

[3] Gutierrez's counsel includes Lieff Cabraser, one of the Objectors' Counsel here.

[4] Expert Report of Alan J. Cox in Support of Defendant Wells Fargo, N.A.'s Motion for Summary Judgment and/or to Decertify Class, at 47–51. The Declaration is attached hereto as Exhibit 1.

variance within the camps of the respective parties in the referenced Wells Fargo case), it is clear that damages in these overdraft reordering cases is a seriously contested issue.

Using the *Gutierrez* case as a comparison (which the Objectors suggest the Court do, and which is a process they implicitly endorse, *see* Objections at 4, 7), during the respective class periods, Wells Fargo had between fifteen and twenty times the number of deposit accounts valued at less than $100,000 as did Fifth Third.[5] Adjusting for the fact that, upon information and belief, Wells Fargo does approximately 40% of its business in California, Wells Fargo at all times had between 6 and 8 times the number of deposit accounts under $100,000 as did Fifth Third. Thus, taking the $69.4 million figure from *Gutierrez's* expert, one could make an estimate of the damages in this case, if litigated against Fifth Third all the way from motion to dismiss, through class certification, trial, judgment, post-trial motions, and any interlocutory or final appeals, to be between $8.6 and $11.5 million based on the number of deposit accounts at each bank. Using Wells Fargo's expert's numbers and deposit accounts yields a much lower damages figure. Even based on Wells Fargo's expert's largest estimate of damages, when those damages are adjusted for "persons who repeatedly overdraft their accounts"—$31.5 million— damages here against Fifth Third would be between $3.9 and $5.2 million.

Plaintiffs' proposed settlement fund of $9.5 million is well within the ballpark of possible recoveries, and that does not even include the significant value of the injunctive relief and remedial provisions, or any upward adjustment to account for the value of Settlement Class Members receiving money now and not three (3) or more years from now, if ever.

In *Closson v. Bank of America N.A.*, No. CGC 04436877 (Cal. Super. Ct. 2009), Judge Kramer entered an order finally approving class action settlement for:

---

[5] According to information on the FDIC website, for example, Wells Fargo had 40,662,926 deposit accounts valued at less than $100,000 in 2008; Fifth Third had 2,051,374 such accounts in 2009.

"Any person who, at any time between December 6, 2000, and December 31, 2007, . . . paid at least one insufficient funds fee, overdraft fee, returned item fee, or similar fee, that was assessed to the person's account within five business days after a Bank of America debit card transaction either occurred or posted to the account, or (ii) paid at least one overlimit fee or similar fee, that was assessed for an account cycle in which a Bank of America debit card transaction either occurred or posted to the person's account. ("Debit card" means debit card, check card or any other bank card used for debit purchases.")

See *Closson v. Bank of America N.A.*, No. CGC 04436877, Order Finally Approving Class

Action Settlement, p. 2-3 (Cal. Super. Ct. Aug. 3, 2009) (hereinafter "Closson Final Order")

(attached as Exhibit 2).[6] That settlement created a $35 million settlement fund from which

settlement class members nationwide could seek relief from harms suffered during a seven (7)

year class period. The settlement in this case creates a fund of $9.5 million for Settlement Class

Members from twelve (12) states to recover harms from a five (5) year class period.[7]

Additionally, during the class period at issue in *Closson*, Bank of America was between eighteen

(18) times (2004) to twenty-eight (28) times (2008) larger than Fifth Third is today.[8] And, the

Bank of America settlement did not have the important and significant injunctive and remedial

provisions included in this proposed settlement.

      Consequently, by comparison, the proposed settlement is significantly more

advantageous than the one approved in *Closson*. The Objectors argue that the *Closson*

settlement is not a fair benchmark because it is on appeal. But the fact remains that the *Closson*

settlement was approved, and stands today as the only other settlement in any case relating to the

---

[6] Despite the Objectors' representations to the contrary, the *Closson* settlement was a nationwide settlement of claims of persons who "paid at least one insufficient funds fee, overdraft fee, returned item fee, or similar fee." *Compare* Closson Final Order *with* Objections at 4, n.1.

[7] *See* Fifth Third Bancorp, Annual Report (Form 10-K), at i (Feb. 2, 2010) (listing in a section titled "Corporate Profile" the twelve (12) states Fifth Third does business in).

[8] According to the FDIC website, for example, Bank of America had 57,441,053 deposit accounts valued at less than $100,000 in 2008; in 2009, Fifth Third had 2,042,049 such accounts.

overdraft re-ordering practices Plaintiffs challenge here.  And by any measure, the proposed

Settlement Agreement is far superior to that in *Closson*:  not only is the amount of relief far

greater for Settlement Class Members here, but the settlement (unlike *Closson*) puts an end to the

re-ordering practices that are the gravamen of all of these lawsuits.

C.       **Plaintiffs have obtained valuable injunctive relief.**

The court's major criticism of the settlement in *Gutierrez* was its lack of injunctive relief.

*See e.g., Gutierrez* Objections, Exhibit B at 3:24-4:1 ("If this is unfair, it ought to be stopped");

4:21-22; 11:17-18; 22:21-23:23.  Further, the *Closson* objections, upon which the Objectors'

heavily rely, were based partially on the complete lack of injunctive relief in the *Closson*

settlement.  In contrast, the proposed settlement here provides—in addition to the monetary

damages being made available to Settlement Class Members—important and substantial

injunctive and remedial relief to the Settlement Class going forward.[9]

The Seventh Circuit has stated that the fairness of the settlement "must be evaluated

primarily on how it compensates class members for these past injuries."  *See Synfuel Tech.*, 463

F.3d at 654.  Notably, the Seventh Circuit has not held that the value of injunctive relief should

not receive consideration.  *See id.*  Operational changes, such as those provided for under the

settlement here, will benefit those Settlement Class Members who continue to do business with

Fifth Third.  *Id.*  Most significantly, the Settlement Agreement achieves what no other litigation,

settlement, legislation or rule-making has managed to achieve—putting an end to high-to-low re-

ordering of debit card transactions.  This represents a significant value to the Settlement Class,

---

[9] As counsel for *Gutierrez* in the Wells Fargo case, Objectors' Counsel had first hand access to this data.
This information and any other information from the Wells Fargo case could have been put in the
Objectors' brief, but was not, likely because Objectors' Counsel know, based on their litigating the
*Gutierrez* case, that this settlement is fair, adequate, and reasonable in light of the risks of litigating this
case to its conclusion.

and is a dramatic departure from the *Closson* settlement and the failed *Gutierrez* settlement. In addition, Fifth Third will train its customer service representatives on overdrafts and grant them the authority to waive any overdraft fee for good cause, including an automatic waiver of one overdraft fee per year. *See* Settlement Agreement at ¶ 10(b). These prospective benefits to the Settlement Class further establish the fairness, adequacy and reasonableness of the proposed settlement.

      **D.**    **Plaintiffs Have Established that the Amount of the Settlement Passes Scrutiny.**

      Despite the Objectors' lengthy citation to *Reynolds*, they neglect to mention that *Reynolds* was decided in the context of final approval of a settlement, and not by the understandably less rigorous preliminary approval standard. *See Kaufman.,* 264 F.R.D. at 447 (citations omitted). Nonetheless, there are multiple ways to evaluate the adequacy of a settlement. The Objectors' argument that "adequacy by analogy" is not legally cognizable is not correct. *See McBean*, 233 F.R.D. at 388–91 (analogizing to other settlements in evaluating the adequacy of a settlement for final approval); *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d at 643 (same). The case law at issue here is unsettled and it is not clear that *In re Checking Account Overdraft Litigation* will ultimately succeed on its merits or, if it does so succeed, survive any appeal to the Eleventh Circuit. Respectfully, Plaintiffs have shown that the Settlement Agreement should be preliminarily approved by the Court.

**III.**    **THE ALLOCATION OF THE SETTLEMENT PROCEEDS IS FAIR, ADEQUATE AND REASONABLE.**

      The proposed fund distribution is fair, adequate and reasonable, and is manifestly more fair than the allocation proposed by the Objectors. By allowing Settlement Class Members to choose a single 45-day period in which to claim a refund of overdraft charges, the allocation

benefits all members of the Settlement Class, but does not unduly benefit those members who chronically made overdraft or insufficient funds transactions over many months or years.

Objectors argue that a "straight *pro rata* allocation based on the damages sustained by each member over the *entire* class period" would be a more equitable allocation.  Objections at 7 (emphasis in original).  But such an allocation would itself be manifestly unfair.  Proposed Settlement Class Counsel's investigation has revealed that it is often the case that Fifth Third account holders are shocked when they first receive a large number of overdraft fees over a certain weekend or other short time period.  It is believed that persons who do not otherwise know are surprised to first learn how Fifth Third assesses overdraft fees when monthly bank statements arrive.  Having had little, if any, fair chance to understand Fifth Third's overdraft policies until this catalyzing moment, and having allegedly received less than proper initial disclosures, an accountholder should have the ability to request reimbursement of every one of these "surprise" overdraft fees.

But one could argue that it is unreasonable to imply, as Objectors do, that anything less than *every* overdraft fee should be reimbursed.  Objectors claim that the 45-day allocation is "manifestly unfair and inequitable" because "a class member who paid a larger total amount of overdraft charges over the entire class period would receive less compensation than a class member who paid a *lower* total amount of overdraft fees but incurred a larger portion of the fees during a single 45-day period."  Objections at 6 (emphasis in original).  But such an argument misses the substantial differences between fees incurred in a certain 45-day period and all fees incurred over the entire class period.  In a case about disclosures, such a distinction matters.  The 45-day allocation comports with rational theories of the case, one of which is that Fifth Third failed to adequately disclose the policies it used to assess overdraft fees, making it nearly

12

impossible for many reasonable and diligent customers to avoid the imposition of these fees. At some point, it could be argued that customers likely did become aware of the Bank's overdraft policies, and had either actual or constructive knowledge of the policies. One could reasonably argue that it would be unfair to reward those customers who continually and chronically made overdraft transactions, even after notice, as Objectors' proposed allocation would do.

When Objectors claim that the allocation plan "overcompensates some class members at the expense of others," they fatally misunderstand the legal bases for the case against Fifth Third. Objections at 7. Fifth Third asserts a fundamental ability to charge an overdraft fee; indeed, such a right is claimed by Fifth Third to be set forth in Federal law. Plaintiffs challenge the incomplete disclosure of transaction reordering practices and other policies by which Fifth Third assesses overdraft fees. Once those practices are disclosed—actually or constructively—Fifth Third's potential liability, it argues, becomes less certain. The Objectors' suggestion to the contrary would put the entire Settlement Class at risk to ensure that certain chronically overdrafted customers with scienter receive a full recovery.

It is arguable that "cognizable differences" exist between the "likelihood of ultimate success" for overdraft fees incurred well after a consumer is put on notice of the fees. *See In re Lucent Tech.,* 307 F. Supp. 2d 633, 649 (D.N.J. 2004) (the allocation plan is fair, adequate, and reasonable despite treating class members differently; "[a] plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable"). It cannot be disputed that chronic overdrafters – those persons who continued to incur overdraft fees even well after actual or constructive notice of Fifth Third's policies – would have a more difficult time convincing a judge or a jury that they are entitled to compensation for what could be characterized as poor financial discipline. As such, any "differences in the treatment of class

13

members" pointed to by the Objectors are justified and appropriate. The fact is that the process of the settlement here does a tremendous job of providing for legitimate claims and protecting against their erosion from those that do not stand at the same level.

When differences exist between plaintiffs' likelihoods of success, it is acceptable for allocation plans to treat plaintiffs differently: "As a general rule, the adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *Corrugated Container,* 643 F.2d at 219–20. As discussed above, the allocation is fair and appropriate. The fact that the cases that the Objectors cite to in opposition to this settlement on this point *approves* the allocation plan at issue supports this conclusion. *See Great Neck Cap. Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers*, L.L.P., 212 F.R.D. 400, 410 (E.D. Wis. 2002); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 184 (E.D. Pa 2000); *Retsky Family Ltd. P'ship v. Price Waterhouse L.L.P.*, No. 97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001); *Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir. 1983). Each Settlement Class Member here has the ability to choose their "best" 45-day period. That, in itself, is a fundamental equality.

## IV.   CLASS COUNSEL HAD SUFFICIENT INFORMATION ON WHICH TO NEGOTIATE A SETTLEMENT.

The settlement is an excellent one. There have been months of arms-length negotiations, and Proposed Settlement Class Counsel have done significant factual investigation and legal analysis. They had multiple meetings and conferences with defense counsel and information was appropriately shared, as is the case not only in class actions but in other litigation as well, where counsel explore and advance early resolution, as mandated by Fed. R. Civ. P. 26(f). They are

14

experienced counsel and have been class counsel in many significant class actions. *See* Exhibit B to Plaintiff's Motion and Incorporated Memorandum in Support of Preliminary Approval of Class Action Settlement and Publishing of Notice, and Setting of a Final Fairness Hearing [D.E. #35-7]. The "stage of the proceedings and amount of discovery" is sometimes used by courts as an indication of "the degree of case development that class counsel have accomplished prior to settlement." *In re Cedant Corp. Litig*., 264 F.3d 201, 235 (3d Cir. 2001). Proposed Settlement Class Counsel have undertaken significant efforts in this regard.

There is no litmus test for the amount of discovery that needs to be performed before a settlement is deemed to be within the range of fair, adequate and reasonable, and the amount and timing of discovery is essentially made moot by a settlement that falls within this range. *See In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2009 WL 5184352, at *11 (W.D. Ky. 2009) (court rejected objectors' arguments that there was insufficient pre-settlement discovery, stating that "formal discovery is not necessary as long as (1) the interests of the class are not prejudiced by the settlement negotiations and (2) there are substantial factual bases on which to premise settlement").

*Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996), cited by the Objectors, makes clear that discovery need not be formal, and that informal "discovery and investigation" includes investigation leading up to filing of the complaint. Indeed, *Isby* affirmed the district court's approval of the settlement agreement at issue, citing pre-settlement discovery and investigation conducted by class counsel prior to filing of the complaint. *Id.*

Proposed Settlement Class Counsel conducted a good deal of informal discovery, both prior to and during settlement negotiations. Informal discovery includes "factual and legal investigation and research." *Mirfasihi v. Fleet Mortgage Corp.*, 2005 WL 1950386 (N.D. Il.

15

2005) *reversed on other grounds*, 450 F.3d 745 (7th Cir. 2006). Proposed Settlement Class Counsel have done significant investigation and research, including: being in contact with numerous Fifth Third account holders, before and during negotiations; performing an exacting and painstaking review of hundreds of pages of bank statements to study the manner in which Fifth Third's practices affected customers; and exhaustively investigating the case law regarding overdraft fees, banking regulations, other banks' practices, and other settlements.

It must also be noted that confirmatory discovery is built into the Settlement Agreement. Proposed Settlement Class Counsel have the option to terminate the Settlement Agreement if confirmatory discovery reveals that the settlement is not fair, reasonable, or adequate. While Proposed Settlement Class Counsel would have no problem exercising such an option, if appropriate, the work done to date by Proposed Settlement Class Counsel does not indicate anything other than a path to final approval for an excellent settlement—the Settlement Agreement before the Court.

## V.      THE USE OF A CLAIMS PROCESS IN THIS CASE IS APPROPRIATE.

The use of claim forms is a well-established method of distributing settlement funds, and courts routinely certify class actions that utilize claim forms. *See e.g., Mangone v. First USA Bank*, 206 F.R.D. 222, 234–35 (S.D. Ill. 2001); *Kaufman v. Am. Exp. Travel Related Servs. Co., Inc.*, 264 F.R.D. 438, 450 (N.D. Ill. 2009) (approving claim forms without further discussion). The Objectors' complaints about utilizing claim forms are without merit.

Foremost, "these objections ignore the rule that a plaintiff in a civil lawsuit bears the burden of proving liability and damages in his or her case." *Mangone*, 206 F.R.D. at 234 (rejecting similar arguments made by an objector to final approval of a class action settlement) (citing *Sprogis v. United Air Lines*, 517 F.2d 387, 392 (7th Cir.1975) (plaintiffs in civil actions

16

bear the burden of proving their damages); *Eleven Line, Inc. v. North Texas State Soccer Ass'n, Inc.*, 213 F.3d 198, 206 (5th Cir.2000)). "Class action status does not alter this basic principle." *Id.*

The Objectors' bold assertion that Settlement Class Members will not engage in an exercise that can potentially yield them up to triple their actual damages is unsupported. *See* Settlement Agreement at ¶ 30(a)(iii). Indeed, despite purportedly representing three (3) objectors, Objectors' Counsel do not support their objection point with a single sworn affidavit from the Objectors. The same logic also defeats the Objectors' attempted analogy to *Smith v. Wells Fargo Bank., N.A.*, Case No. GIC802664 (Cal. Super. Ct.), and their later statement that "[s]uch an unnecessary claims procedure will unnecessarily deter the filing of claims . . . ." Objections at 9. To the extent that only 16 months of account statements are made available to Settlement Class Members, this is intended to supplement records that Settlement Class Members should already have in their possession.

The Objectors' attempt to make Fifth Third's verification of claims appear nefarious is contorted logic. Verifying claims is in the best interest of the Settlement Class, as it ensures that only valid claims are paid, which creates a larger pool from which Settlement Class Members can recover, and it places the burden on Fifth Third to do so. Furthermore, the Objector's arguments that Fifth Third could "easily" make determinations for each Settlement Class Member and deposit the appropriate amount directly into their accounts suffers from at least two flaws. *See* Objections at 9. First, making such determinations would require Fifth Third to dedicate personnel and additional monies and resources to the administration of the settlement, which would decrease the amount of money available to Settlement Class Members, and challenge its interest in settlement. Second, the mailing of a check, as opposed to direct deposit,

17

allows Settlement Class Members to choose how to use the funds; indeed, Settlement Class Members may no longer have an account with Fifth Third.[10]

Lastly, Objectors' footnote 4, which argues that Settlement Class Members only have a 45-day period to complete claim forms, is wrong. Objections at 9, n.4. Notice is to be completed no later than one-hundred (100) days after entry of preliminary approval. Settlement Agreement ¶ 14. Settlement Class Members have from the beginning of the notice process until 45 days after the final fairness hearing (a period of 145 days), to submit a claim form.[11] The Objectors' contrary view represents a fundamental misunderstanding of the terms of the settlement. Indeed, the Objectors will have even more time, as they already know of the settlement.

## VI. OBJECTORS' COUNSEL AND THEIR CONDUCT TO DATE.

Objectors' Counsel state that they were "appointed by Judge King to represent the interests of Fifth Third class members in the MDL." That statement is, at best, questionable. Objectors' Counsel were appointed as lead counsel in the MDL before any known lawsuits were filed against Fifth Third relating to these overdraft ordering practices. Judge King is not known to have issued any ruling in which he has designated the PEC to represent the interests of the putative class members in the cases against Fifth Third. Had he done so, Objectors' Counsel would have surely included it in their MDL filings. The lawsuits filed by Plaintiffs were filed months before Objector Keyes filed her lawsuit in the Southern District of Florida (even though she lives in Ohio and was suing an Ohio-based bank). Those lawyers knew of the *Schulte* case

---

[10] Some Settlement Class Members may not want Fifth Third determining their claims against itself. Having a neutral third-party reviewing said claims is a reasonable and often-used alternative.

[11] Even assuming, *arguendo*, that a Settlement Class Member does not receive notice until the end of the completion of the notice plan, they will still have approximately three (3) months to fill out and submit a claim form.

and never called any of Plaintiff Schulte's counsel to advise them of their filing. The PEC petitioned the Judicial Panel on Multidistrict Litigation (the "Panel") to centralize all cases against Fifth Third in Florida before Judge King; upon learning of this settlement, the Panel, without delay, denied the PEC's motion.[12]

In fact, Judge King recently granted Fifth Third's motion for an extension of time to respond to the *Keyes* complaint case—over the strident objections of the PEC. In their opposition to the motion, the PEC asked Judge King to deny the motion because "the proposed settlement in *Schulte* is *unlikely* to be approved and, therefore, *Schulte* and *Willard* will eventually be transferred into MDL 2036 . . . ."[13] Judge King rejected their argument and granted the extension.[14]

On June 1, 2010, the Court directed one of the lead counsel in the MDL, Robert C. Gilbert, to contact Ms. Schulte's attorney, Ben Barnow, and Fifth Third's counsel, Patrick Fischer, to try to resolve his concerns about the settlement. Late in the evening on June 7, 2010, Mr. Gilbert sent an email to Mr. Barnow and others asking to schedule a conference call in the afternoon of June 8, 2010. Counsel for Plaintiffs asked Mr. Gilbert to provide some indication of the objections prior to the call, so that they could be prepared to engage in a meaningful dialogue, but Mr. Gilbert did not do so, and after repeated requests, said they could be discussed on the call. *Id.* When the call commenced—on the afternoon before Objectors' Counsel were to

---

[12] A true and correct copy of the MDL Panel's ruling is attached hereto as Exhibit 3.

[13] A true and correct copy of the PEC's Opposition to Fifth Third's motion for extension of time is attached hereto as Exhibit 4.

[14] A true and correct copy of Judge King's order is attached hereto as Exhibit 5.

19

file their objections—Objectors Counsel did not engage in any meaningful attempt to resolve their purported objections.[15]  The next day, Objectors filed their objections.

The instant objection does not comport with the objection process contemplated by law, the Settlement Agreement, or the view expressed by the Panel, and appears to be nothing more than lawyer-driven argument.

**CONCLUSION**

For all of the foregoing reasons and those stated in Plaintiffs' motion for preliminary approval, Plaintiffs respectfully request that the Court deny the objections set forth by the Objectors, preliminarily approve the settlement, enter an Order in accordance with the relief requested in Plaintiffs' motion for preliminary approval, and grant such other relief that the Court deems just and appropriate.


Dated: May 27, 2010                          Respectfully submitted,


                                             __/s/ Ben Barnow_____
                                             Ben Barnow
                                             **Barnow and Associates, P.C.**
                                             1 North LaSalle, Suite 4600
                                             Chicago, IL  60602
                                             (312) 621-2000

---

[15] The Objectors, at footnote 3 of their filing, state that Proposed Settlement Class Counsel did not respond to a request as to whether any discovery had been conducted; that is not accurate.  Rather, Objectors' Counsel asked Proposed Settlement Class Counsel if any formal discovery had been conducted, and attempted throughout the call to turn the call into a cross-examination of counsel, instead of attempting to address their purported concerns about the proposed settlement's structural mechanisms.  Additionally, during the call, attorney Barry R. Himmelstein became extremely agitated and resorted to profanity, which nearly ended the call.  Screaming, attempts at cross examination, and denials of knowledge possessed, are not, in Proposed Settlement Class Counsel's view, the essence of good faith discussions directed by a court to resolve alleged concerns regarding a proposed settlement.

<u>*Of Counsel:*</u>

Burton H. Finkelstein
**Finkelstein Thompson LLP**
The Duvall Foundry
1050 30th Street, N.W.
Washington, D.C. 20007
(202) 337-8000

Hassan A. Zavareei
**Tycko & Zavareei LLP**
Suite 808
2000 L Street, N.W.
Washington, D.C. 20036
(202) 973-0900

David James Worley
**Evangelista & Associates, LLC**
One Glenlake Parkway
Suite 700
Atlanta, GA 30328
404-478-7195

*Proposed Settlement Class Counsel*

## Certificate of Service by Electronic Means

I, Ben Barnow, one of the attorneys for Plaintiff, hereby certify that the proceeding document was caused to be served electronically this 17th day of June 2010, pursuant to ECF as to Filing users, and that I shall comply with LR 5.5 as to any party who is not a filing user or represented by a filing user.

/s/ Ben Barnow____