UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| SHANNON SCHULTE, on behalf of herself and all others similarly situated | ) ) | Case No. 1:09-CV-06655 |
| | ) | The Honorable Robert M. Dow, Jr. |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| FIFTH THIRD BANK | ) ) | |
| Defendant. | ) ) | |

**REPRESENTATIVE PLAINTIFFS' MOTION
FOR, AND MEMORANDUM IN SUPPORT OF, FINAL
APPROVAL OF CLASS ACTION SETTLEMENT, AND AWARD OF
<u>ATTORNEYS' FEES, COSTS, AND EXPENSES, AND INCENTIVE AWARDS</u>**

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

I. The Litigation ...................................................................................................2

    A. The Settlement Class Definition  ............................................................3

    B. Settlement Benefits ...............................................................................4

        1. Reimbursement of Overdraft Fees ...............................................4

        2. Modification of Business Practices ...............................................5

        3. Overdraft Assistance ....................................................................6

        4. Notice and Claims Administration Costs ......................................6

        5. Attorneys' Fees, Costs, and Expenses, and Incentive Awards.................... 7

    C. Confirmatory Discovery.........................................................................7

    D. Expert Evaluation..................................................................................8

    E. The Notice Program Was Substantial and Effective .................................9

II. Final Approval of the Settlement is Appropriate ..................................................11

    A. The Strength of Plaintiffs' Case ............................................................12

    B. The Likely Complexity, Length, and Expense of Litigation....................18

    C. The Amount of Opposition to the Settlement ..........................................19

    D. The Opinion of Competent Counsel.......................................................20

    E. The Amount of Discovery Completed at the Time of Settlement............21

III. Objections to the Settlement ...............................................................................22

    A. Objectors Represented By Counsel .......................................................22

**1.** Objectors Represented by Members of the PEC in the Overdraft MDL......22

    **a)** No Analysis of the Claims at Issue in this Litigation..............23

    **b)** Evidence Relating to the Strength of Plaintiffs' Case.............26

    **c)** The Amount of Discovery Engaged in at the Time of Settlement .......................................................................26

    **d)** The Settlement Allocation...............................................27

    **e)** The Claims Process.........................................................30

    **f)** The Scheduling of the Final Fairness Hearing......................31

**2.** The Katz Objection ........................................................31

**B.** The *Pro Se* Objections....................................................32

**IV.** Attorneys' Fees, Costs, and Expenses............................................34

    **A.** Attorneys' Fees ................................................................34

        **1.** Attorneys' Fee Awards in Other Cases ........................35

        **2.** Agreements Between Plaintiffs and their Counsel.............37

        **3.** The Risk of Nonpayment ..........................................37

        **4.** The Quality of Settlement Class Counsel's Performance ...........38

        **5.** The Amount of Work Necessary to Resolve this Litigation .......39

        **6.** The Stakes of this Litigation ......................................40

    **B.** Reasonable Costs and Expenses........................................40

**V.** Incentive Awards................................................................41

CONCLUSION.......................................................................41

TABLE OF AUTHORITIES

<u>Cases</u>

*Armstrong v. Bd. of Sch. Directors of City of Milwaukee*,
  616 F.2d 305 (7th Cir. 1980) ...................................................................................23

*Browning v. Yahoo Inc.*,
  No. C04-01463, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007)....................................31, 32, 33

*Closson v. Bank of Am. N.A.*,
  No. CGC 04436877 (Cal. Super. Ct. Aug. 3, 2009) ............................................................24, 25

*Cook v. Niedert*,
  142 F.3d 1004 (7th Cir. 1998) ...................................................................................41

*Cowin Equip. Co., Inc. v. Gen. Motors Corp.*,
  734 F.2d 1581 (11th Cir. 1984) ...................................................................................15

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)...................................................................................21

*Daniels v. PNC Bank, N.A.*,
  738 N.E.2d 447 (Ohio Ct. App. 2000) ...................................................................................14

*Dawson v. Pastrick*,
  600 F.2d 70 (7th Cir. 1979) ...................................................................................23, 24

*Donovan v. Estate of Frank E. Fitzsimmons*,
  778 F.2d 298 (7th Cir. 1985) ...................................................................................39

*Felzen v. Andreas*,
  134 F.3d 873 (7th Cir. 1998) ...................................................................................23

*Fetter v. Wells Fargo Bank, N.A.*,
  110 S.W.3d 683 (Tex. App. Ct. 2003) ...................................................................................14

*Gaskill v. Gordon*,
  160 F.3d 361 (7th Cir. 1998) ...................................................................................35, 36

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000)...................................................................................37

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ...................................................................................9

iii

*Guitierrez v. Wells Fargo Bank,*
    730 F. Supp. 2d 1080 (N.D. Cal. Aug. 10, 2010) ..............................................23, 24

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998) ....................................................................................31

*Hassler v. Sovereign Bank,*
    374 Fed. App'x 341 (3d Cir. 2010)......................................................................14, 38

*Hill v. St. Paul Fed. Bank for Savings,*
    329 Ill. App. 3d 705, 768 N.E.2d 322 (2002) ..........................................................15

*IUE-CWA v. General Motors Corp.,*
    238 F.R.D. 583 (E.D. Mich. 2006) ............................................................................21

*In re Austrian and German Bank Holocaust Litig.,*
    80 F. Supp. 2d 164 (S.D.N.Y. 2000).........................................................................18

*In re Cendant Corp. Litig.,*
    264 F.3d 201 (3d Cir. 2001).......................................................................................28

*In re Checking Acct. Overdraft Litig.,*
    MDL No. 2036, 2010 WL 841305 (S.D. Fla. Mar. 11, 2010) ......................16, 31, 32

*In re Lucent Techs., Inc., Secs. Litig.,*
    307 F. Supp. 2d 633 (D.N.J. 2004) ............................................................................28

*In Re Mexico Money Transfer Litig.,*
    267 F.3d 743 (7th Cir. 2001) ..............................................................................28, 36

*In re PaineWebber Ltd. Partnerships Litig.,*
    171 F.R.D. 104 (S.D.N.Y. 1997) ...............................................................................28

*In re Sunrise Sec. Litig.,*
    131 F.R.D. 450 (E.D. Pa. 1990).................................................................................19

*In re Synthroid Mktg. Litig.,*
    264 F.3d 712 (7th Cir. 2001) ................................................................... 25, 34, 37, 40

*In re Synthroid Mktg. Litig.,*
    325 F.3d 974 (7th Cir. 2003) .....................................................................................24

*In re Tobacco II Cases,*
    207 P.3d 23 (Cal. 2009)..............................................................................................24

*In re Transunion Corp. Priv. Litig.*,
   629 F.3d 741 (7th Cir. 2011) ...............................................................................37

*Isby v. Bayh*,
   75 F.3d 1191 (7th Cir. 1996) ...........................................................11, 12, 36, 37

*Jones v. Diamond*,
   636 F.2d 1364 (5th Cir. 1981) ......................................................................37, 37

*Kirchoff v. Flynn*,
   786 F.2d 320 (7th Cir. 1986) ..............................................................................36

*Pella Corp. v. Saltzman*,
   606 F.3d 391 (7th Cir. 2010) .........................................................................16, 17

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985).............................................................................................9

*Reynolds v Beneficial Nat'l Bank*,
   288 F.3d 277 (7th Cir. 2002) ..............................................................................12

*Smith v. First Union Nat'l Bank*,
   958 S.W.2d 113 (Tenn. Ct. App. 1997) ..............................................................14

*Spivey v. Adaptive Mktg. LLC*,
   622 F.3d 816 (7th Cir. 2010) ..............................................................................16

*Synfuel Techs., Inc. v DHL Express (USA) Inc.*,
   463 F.3d 646 (7th Cir. 2006) ..........................................................................1, 12

*Taubenfeld v. Aon Corp.*,
   415 F.3d 597 (7th Cir. 2005) ..............................................................................35

*Trombley v. Nat'l City Bank*,
   No. 10-cv-00232, 2011 WL 87235 (D.D.C. Jan. 11, 2011).............................22, 29

*Weinberger v. Kendrick*,
   698 F.2d 61 (2d Cir. 1982).................................................................................19

**Statutes, Rules, and Regulations**

Fed. R. Civ. P. 26(a)(1).............................................................................................27

Fed. R. Civ. P. 26(f)..................................................................................................27

12 C.F.R. § 205(c)(1) ................................................................................................33

12 C.F.R. § 205(c)(2) ................................................................................................33

Cal. Bus. & Prof. Code §§ 17200 *et seq.* ...............................................................24

**Secondary Authorities and Treatises**

Manual for Complex Litigation (Fourth) at § 11.423 (2004) .....................................21

NOW COME Representative Plaintiffs,[1] Shannon Schulte and Marlene Willard, individually and on behalf of the Settlement Class, by and through Settlement Class Counsel, and as their Motion for and Memorandum in Support of Final Approval of Class Action Settlement, and Award of Attorneys' Fees, Costs and Expenses, and Incentive Awards, state as follows:

## INTRODUCTION

On September 10, 2010, after substantial briefing and due consideration, the Court entered its order certifying the Settlement Class and granting preliminarily approval of the settlement set forth in the Settlement Agreement between Representative Plaintiffs and Fifth Third Bank (collectively, the "Settling Parties"), in this case relating to Fifth Third's practice of re-sequencing Fifth Third Debit Card Transactions.[2] Opinion and Order of Preliminary Approval (Dow, J. Sept. 10, 2010) ("Preliminary Approval Order"). The settlement is an excellent one and, as the Court recognized in granting preliminary approval of the settlement, is "relatively generous when compared to settlements in analogous circumstances." *Id.* at 5-6. The comprehensive Notice Program reached at least 89.70% of Settlement Class Members and Settlement Class Members' reaction to the settlement was overwhelmingly positive, as is evidenced by the Claims Administrator's receipt of 78,786 claims as of March 7, 2011. In contrast to this high participation rate, only 342 Settlement Class Members excluded themselves from the settlement and 11 objections (including those liberally construed as objections) were submitted.

An analysis of the factors outlined by the Seventh Circuit in *Synfuel Technologies., Inc. v DHL Express (USA) Inc.*, 463 F.3d 646 (7th Cir. 2006), establishes that the settlement is fair,

---

[1] The terms used herein have the same meaning as defined in the Settlement Agreement, which is attached hereto as Exhibit A.
[2] "Debit Card Transaction" or "Fifth Third Debit Card Transaction" means a transaction effectuated with or relating to such Fifth Third Debit Card(s), including but not limited to automated teller machine ("ATM") transactions and point of sale ("POS") transactions. Settlement Agreement ¶ 1(l).

reasonable, and adequate. Furthermore, Representative Plaintiffs' request for an award of attorneys' fees, costs, and expenses, and for incentive awards is reasonable. Thus, Representative Plaintiffs respectfully urge the Court to grant final approval of the settlement, and award the attorneys' fees, costs, and expenses, and incentive awards requested herein.

## I.    The Litigation

This consumer class action relates to Fifth Third's practice of re-sequencing its customers' Debit Card Transactions from highest-to-lowest amount from October 21, 2004, through July 1, 2010 (the "Class Period"), which Plaintiffs allege was unlawful.[3] Settlement Agreement ¶ 3. Plaintiff Schulte filed her complaint with the Court on October 21, 2009, and Plaintiff Willard filed her complaint on February 1, 2010, with the United States District Court for the Northern District of Georgia. *Id.* ¶ 2. Although the lawsuits have some variances, the claims asserted include: breach of contract, breach of implied covenant of good faith and fair dealing, unconscionability, conversion, consumer fraud, and unjust enrichment.

On February 16, 2010, Fifth Third filed a motion to dismiss in the *Schulte* case. [D.E. #17]. On March 2, 2010, the United States Judicial Panel on Multidistrict Litigation ("JPML"), entered its Conditional Transfer Order ("CTO 13") conditionally transferring the Actions[4] to the Southern District of Florida, where the Multidistrict Litigation, *In re Checking Account Overdraft Litigation* (the "Overdraft MDL"), was and remains pending. Shortly thereafter, Plaintiff Schulte, Plaintiff Willard, and Fifth Third each filed oppositions to CTO 13 and, on

---

[3] "Overdraft Fee" means an insufficient funds fee, overdraft fee, returned item fee, daily overdraft fee, overlimit fee, or other similar fee, incurred as a result of the "re-sequencing" of a Fifth Third Debit Card Transaction in non-chronological order that was not previously reversed, refunded, or returned to the Settlement Class Member by Defendant. Settlement Agreement ¶ 1(s).

[4] "Actions" means *Schulte v. Fifth Third Bank*, Case No. 1:09-CV-06655 (N.D. Ill.), and *Willard v. Fifth Third Bancorp, Inc.*, Case No. 1:10-CV-00271 (N.D. Ga.).

2

April 2, 2010, Fifth Third filed a motion with the JPML requesting that the Actions be transferred to the Court for coordinated or consolidated pretrial proceedings.

That same day, Objector Keyes, who is represented, *inter alia*, by various counsel from the Overdraft MDL, filed a complaint against Fifth Third in the United States District Court for the Southern District of Florida. Less than a week later, on April 7, 2010, Objector Keyes requested that her case be consolidated into the Overdraft MDL, which was granted on April 19, 2010. On April 19, 2010, an attorney representing Objector Keyes sent a letter to the JPML arguing that Fifth Third's motion to transfer the Actions was inappropriate, because it would create a new MDL and Objector Keyes' case had already been consolidated into the Overdraft MDL.

On May 27, 2010, after months of arm's length negotiations, the Settling Parties entered into the Settlement Agreement, and filed with the Court a Motion for Preliminary Approval of Class Action Settlement, Publishing of Notice, and Setting of a Final Fairness Hearing. Later that day, counsel for the Settling Parties notified the JPML of their entering into the Settlement Agreement at a hearing held by the JPML and, on June 3, 2010, the JPML vacated CTO 13, ruling that the Court should preside over the settlement. On June 9, 2010, the Keyes Objectors filed an objection to preliminary approval of the settlement.

On September 10, 2010, after briefing and learned review, the Court entered its Preliminary Approval Order, finding that the settlement "appears relatively generous when compared to settlement in analogous circumstances." Preliminary Approval Order at 5-6.

**A.     The Settlement Class Definition**

The Settlement Class certified by the Court in its Preliminary Approval Order is defined as follows:

All persons in the United States who hold or held a Fifth Third Account[5] who at any time during the Class Period incurred at least one Overdraft Fee (as defined in the Settlement Agreement) associated with at least one Fifth Third Debit Card Transaction. Excluded from the Settlement Class are Fifth Third Bank, any parent, subsidiary, affiliate or sister company of Fifth Third Bank, and all officers or directors of Fifth Third Bank or any parent, subsidiary, affiliate or sister company at any time during the Class Period, and the legal representatives, heirs, successors, and assigns of any of the foregoing. The Court presiding over any motion to approve the Settlement Agreement is excluded from the Settlement Class. Also excluded from the Settlement Class is any person who timely submits a valid request to be excluded from this Settlement.

Preliminary Approval Order at 10.

### B. Settlement Benefits

#### 1. Reimbursement of Overdraft Fees

The settlement provides that Settlement Class Members shall receive reimbursement of claimed Overdraft Fees incurred during any one single forty-five day period during the Class Period, to be paid from a $9,500,000 Settlement Fund that Fifth Third agreed to establish under the settlement.[6] Settlement Agreement ¶¶ 9, 23, 24.

There is no limit on the amount or value of Overdraft Fees for which a Settlement Class Member may claim reimbursement. *Id.* After Administrative Costs are paid from the Settlement Fund, if the monetary value of valid claims submitted is less than the amount of money remaining in the Settlement Fund, the remainder shall be distributed on a *pro rata* basis to each Settlement Class Member who submitted a valid claim, with each such Settlement Class Member receiving up to three times the amount claimed on their Claim Form. *Id.* Conversely, if the monetary value of valid claims is more than the amount remaining in the Settlement Fund after Administrative Costs are deducted all claims will be prorated. *Id.* In the event that any amount is

---

[5] "Fifth Third Account" means an account maintained by or with Fifth Third or any subsidiary or affiliate of Fifth Third. Settlement Agreement ¶ 1(m).
[6] "Administrative Costs" means the costs of claims administration, attorneys' fees, costs, and expenses, incentive awards, and Notice (subject to certain exclusions, *see* text accompanying Section II.B.4.).

remaining in the Settlement Fund after valid claims are paid, the settlement provides that all such amounts shall be distributed through a *cy pres* to one (1) nonprofit credit counseling organization, which shall be agreed to by Settling Parties and subject to the approval of the Court, in each of the twelve (12) states where Fifth Third has branches (Ohio, Illinois, Georgia, Florida, Tennessee, Kentucky, Indiana, West Virginia, North Carolina, Missouri, Michigan, and Pennsylvania). *Id.* ¶¶ 30(c)(iii), 31.

### 2.    Modification of Business Practices

In addition to the significant monetary relief provided, the settlement includes valuable and important injunctive relief, as Fifth Third has agreed to modify its business practices so that Fifth Third Debit Card Transactions will no longer be re-sequenced from the highest to lowest amount prior to being processed, but will be processed in chronological order (*i.e.*, in the order that they are presented to Fifth Third for payment, regardless of amount). *Id.* ¶ 10(a). In Settlement Class Counsel's belief, this relief is groundbreaking, in that no other bank defendant has agreed to that concession in a case settlement related to the re-sequencing of debit card transactions. Undoubtedly, this relief is important and valuable to the Settlement Class, as it is likely, if not certain, that many Settlement Class Members will continue to bank with Fifth Third, and the relief will prevent these Settlement Class Members from incurring overdraft fees in the future as the result of Fifth Third's re-sequencing of Debit Card Transactions. Plaintiffs' expert, Mr. Thomas A. Tarter, estimated the present value of this injunctive relief to the Settlement Class to be approximately $58.8 million over the next five years or $108.3 million over the next ten years. Mr. Tarter's Report is attached hereto as Exhibit B.

### 3. Overdraft Assistance

The settlement also provides that all telephone operators at Fifth Third's call centers shall be trained on issues related to overdraft fees and other overdraft issues, and have the ability and authority to waive any overdraft fee for good cause ("good cause" may include, but not be limited to, an automatic waiver of one (1) overdraft fee per year, plus those resulting from errors in account reporting and other hardship situations such as hospitalization or illness causing an inability to examine account balances (medical documentation may be required for such claims)). *Id.* ¶ 10(b).

### 4. Notice and Claims Administration Costs

The settlement provides that all costs of Notice and Claims Administration shall be paid either from the Settlement Fund or Fifth Third directly. *Id.* ¶¶ 14, 20, 22. Pursuant to the settlement, Fifth Third is responsible for the following activities relating to notice and claims administration, the costs of which will not be reimbursed from the Settlement Fund:

1) the printing and mailing of stuffers in monthly statements;

2) the purchasing of all materials relating to the printing and mailing of stuffers in monthly statements;

3) the printing of language on the outside of envelopes containing such monthly statements advising Settlement Class Members of the class action Settlement Notice documents contained therein;

4) the printing of language on the monthly statements advising Settlement Class Members of the class action Settlement Notice documents; and

5) the maintenance of a banner on Fifth Third's website viewable by all Fifth Third customers and identifying the settlement website address.

*Id.* ¶ 15. Settlement Class Counsel has been informed by the Claims Administrator that Fifth Third has incurred costs and expenses of over $416,000 in performing these obligations. All

other costs of Notice and Claims Administration shall be paid from the Settlement Fund. *Id.* ¶¶ 14, 20.

### 5. Attorneys' Fees, Costs, and Expenses, and Incentive Awards

Pursuant to the Settlement Agreement, all attorneys' fees, costs, and expenses, and incentive awards, subject to the approval of the Court, shall be paid from the Settlement Fund. *Id.* ¶¶ 11, 12, 29.

### C. Confirmatory Discovery

Pursuant to the settlement, Settlement Class Counsel were entitled to reasonable confirmatory discovery from Fifth Third to confirm their assessment of the settlement as fair, reasonable, and adequate. *Id.* ¶ 37.

At Settlement Class Counsel's request, Fifth Third provided Settlement Class Counsel with detailed non-public information regarding a wide range of Fifth Third's data and policies with regard to deposit accounts. Fifth Third also provided detailed financial information, including: data and information pertaining to monthly summaries of consumer overdraft item fees, daily fee dollars, waivers, reversals and charge offs; net consumer fees; principal losses; realized fees; the number of monthly overdraft occurrences; the number of accounts with occurrences (that is, the posting of an overdraft fee); and the average number of overdraft occurrences. In addition, Fifth Third provided up-to-date data covering both the final months of the Class Period and several months following the Class Period.

Settlement Class Counsel spent a significant amount of time reviewing and analyzing this data and information. Additionally, the information and data was analyzed and utilized by Mr. Tarter in the preparation of his Expert Report.

In addition to reviewing documents and other information provided by Fifth Third, Settlement Class Counsel also participated in several in-person and telephone conferences with Fifth Third's attorneys and management. During this process, Fifth Third made bank officials available to Settlement Class Counsel and Mr. Tarter for direct investigation and questioning. Settlement Class Counsel and Mr. Tarter participated in meetings and teleconferences with Fifth Third officials, including Kevin Sullivan, Senior Vice President, Chief Financial Officer for Retail, Business Banking, and Investment Advisors. Further, Class Counsel engaged in several telephonic conferences with Fifth Third officials (both with and without Mr. Tarter) to further analyze Fifth Third's data and data storage procedures and policies.

At the conclusion of the confirmatory discovery process, Settlement Class Counsel determined that the settlement was fair, reasonable, and adequate.

### D.   Expert Evaluation

Settlement Class Counsel retained Mr. Thomas Tarter, an expert in banking and financial institutions, to prepare an expert report estimating: (1) the amount of excess overdraft fees caused by Fifth Third's practice of re-sequencing debit card and ATM transactions from the highest to lowest amount during the Class Period; and (2) the present value of Fifth Third's change in business practices, required under the settlement, to no longer re-sequence debit card and ATM transactions from the highest to lowest amount. Tarter Rep. at 3, 4, 6. Fifth Third provided Mr. Tarter with detailed, non-public information, designated as confidential, which Mr. Tarter utilized in developing models to estimate these amounts. *Id.* at 5, 8-9.

Mr. Tarter estimates that during the Class Period, Fifth Third charged approximately $97.7 million in overdraft fee charges as a result of its re-sequencing of Fifth Third Debit Card Transactions. *Id.* at 15. Mr. Tarter also estimates that the present value of the injunctive relief

provided for by the settlement by Fifth Third's agreement to end its practice of re-sequencing Debit Card Transactions is $58.8 million over the next five years, or $108.8 million over the next ten years. *Id.* at 16.

### E. The Notice Program Was Substantial and Effective

Constitutional due process requires that absent class members be provided the best notice practicable, reasonably calculated to apprise them of the pendency of the action and affording them the opportunity to object. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985); Fed. R. Civ. P. 23(c)(2)(B). The mechanics of the notice process, however, "are left to the discretion of the court subject only to the broad 'reasonableness' standard imposed by due process." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 121 (8th Cir. 1975). Here, Notice was extremely effective and provided Settlement Class Members the best notice practicable under the circumstances.

The Notice Program was developed and implemented by Hilsoft Notifications, one of the premier class action notification organizations in the country. As summarized herein and explained in detail in the Affidavit of Cameron R. Azari, Esq., on Implementation and Adequacy of Settlement Notice Program ("Azari Aff."), attached hereto as Exhibit C, Fifth Third was able to identify names and contact information for virtually all potential Settlement Class Members, and individual Notice reached approximately 89.7% of potential Settlement Class Members. *Id.* ¶¶ 7, 13.

A summary notice of the settlement ("Summary Statement Notice") was included in the monthly statements of all potential Settlement Class Members who were current Fifth Third customers as of December 1, 2010, and who received monthly paper statements by mail. *Id.* ¶ 14. The Summary Statement Notices were inserted in the envelopes containing the monthly paper

statements so that the headline of the Summary Statement Notices faced the flap of the envelopes and the Summary Statement Notices would be the first thing seen when the envelopes were opened. *Id.* The outside of the envelopes containing the monthly paper statements mailed to potential Settlement Class Members included a printed "call out" to alert Settlement Class Members that important legal information was included. *Id.* Additionally, the enclosed statements included text directing Settlement Class Members to the enclosed Summary Statement Notices. *Id.* ¶ 14. Fifth Third has reported that 1,425,631 account statements including the Summary Statement Notice were mailed to potential Settlement Class Members. *Id.* ¶ 15.

In addition, a Summary Postcard Notice was mailed to potential Settlement Class Members who were Fifth Third customers who did not receive monthly statements by mail, and to all potential Settlement Class Members who were former Fifth Third customers. *Id.* ¶ 16. Prior to mailing, the addresses of potential Settlement Class Members who were former Fifth Third accountholders were verified and, where appropriate, updated. *Id.* ¶¶ 16-18. Altogether, 2,711,981 Summary Postcard Notices were mailed to potential Settlement Class Members. *Id.* ¶ 23. Total mailings of settlement notices thus exceeded 4.1 million.

Publication notice of the settlement appeared in a weekday edition of 19 daily newspapers, having a combined daily circulation of over 3.6 million, in markets where Fifth Third has a significant number of branch offices. *Id.* ¶¶ 26-29. Additionally, a Court-approved informational release was issued to approximately 5,600 press outlets throughout the United States. *Id.* ¶ 31.

Notice was also posted on the settlement website, www.OverdraftSettlement.com, in English and Spanish. *Id.* ¶ 33. The settlement website allows Settlement Class Members to view information about the settlement, including copies of the Detailed Notice, Settlement Agreement,

Preliminary Approval Order, and Order Rescheduling the Final Fairness Hearing and Corresponding Dates. *Id.* The settlement website also contains answers to frequently asked questions and includes contact information for the Claims Administrator. *Id.* By visiting the settlement website, Settlement Class Members can view and file a Claim Form, and can download and print a paper Claim Form.[7] *Id.* As of March 7, 2011, there had been 243,574 website visitor sessions in which 1,291,650 website pages were viewed, which equates to just over 5.3 pages per visitor session. *Id.* ¶ 34. Additionally, a banner displaying the notice headline was also posted on Fifth Third's website, www.53.com, throughout the notice period, which included the address of the settlement website, www.OverdraftSettlement.com. *Id.* ¶ 30.

On November 24, 2010, a toll-free number established by the Claims Administrator became operational. *Id.* ¶ 36. The number allowed Settlement Class Members to listen to answers to frequently asked questions and/or to request that a copy of the Claim Form or Detailed Notice be mailed to them. *Id.* As of March 7, 2011, the toll-free number had handled 66,906 calls representing 181,206 minutes of use. *Id.*

Altogether, the Notice Program, with its extensive and thorough efforts to reach as many Settlement Class Members as possible, provided the Settlement Class with the best notice practicable under the circumstances.

## II.    Final Approval of the Settlement is Appropriate

"Federal courts naturally favor the settlement of class action litigation." *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996). When evaluating the fairness of a settlement, the Court must consider the following factors: (1) the strength of Plaintiffs' case compared to the value of the settlement; (2) the likely complexity, length, and expense of the litigation; (3) the amount of

---

[7] The website was made secure using a Secure Socket Layer (SSL) Certificate through Network Solutions. A Network Solutions validation emblem appeared on the website home page and other website pages. *Id.* ¶ 33.

opposition to the settlement; (4) the opinions of competent counsel; (5) and the stage of the proceedings and amount of discovery completed at the time of settlement. *Synfuel Techs, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (citations and quotations omitted). When determining whether to grant final approval to a settlement, the court's inquiry is limited to whether "the proposed settlement is lawful, fair, reasonable, and adequate." *Isby*, 75 F.3d at 1196. An analysis of these factors here illustrates that the settlement is fair, reasonable, and adequate.

### A.  The Strength of Plaintiffs' Case

The "most important factor relevant to the fairness of a class action settlement" is the "strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel Techs. Inc.*, 463 F.3d at 653. When balancing the strength of Plaintiffs' case against the benefits offered under the settlement, the Court should begin by quantifying the net expected value of continued litigation, through estimating the "range of possible outcomes and ascrib[e] a probability to each point on the range" and then discounting the outcomes to the present using a reasonable interest rate tailored to the facts of this case. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-82 (7th Cir. 2002). Although a high degree of precision cannot be expected in valuing the litigation, the Court should, nevertheless, attempt to come up with ballpark figures from which to derive whether the settlement is within the range of reasonable settlements. *Synfuel Techs. Inc.*, 463 F.3d at 653.

The chance of achieving the significant monetary and injunctive relief obtained under the settlement was remote through continued litigation. The reasons are apparent in the record. First, the settlement was the first overdraft settlement entered into other than *Closson*, which the settlement transcends. Second, the settlement includes important and valuable injunctive relief

that, to Settlement Class Counsel's knowledge, has not been obtained in any other overdraft case. Third, the legal principles available in *Gutierrez* were not available in this case and the decision is on appeal in the Ninth Circuit. Remote clearly equates with low percentages. A projected result obtained by multiplying a low percentage chance of winning against Plaintiffs' expert's estimated amount of damages, $97.7 million, and then discounting such figure to the present, does not come close to the valuable and certain results obtained by the settlement.

While Plaintiffs believe that their claims have merit, they acknowledge that they would encounter a number of significant risks in litigating this matter to conclusion, including the possibility of receiving no recovery on the claims. Were this litigation to proceed absent settlement, Fifth Third's Memorandum in Support of its Motion to Dismiss illustrates that it would likely argue that Fifth Third was contractually authorized to re-sequence Settlement Class Members' Debit Card Transactions from the highest to lowest amount and that the terms of the Deposit Agreement preclude a finding that Fifth Third engaged in any deception or unfair conduct. [D.E. #23] at 2-3. Fifth Third has represented that all Fifth Third customers signed a signature card when opening a personal deposit account with Fifth Third, which provides that the terms and conditions contained in the card, "together with resolutions or authorizations which accompany this signature card, if applicable, and the Rules, Regulations, Agreements and Disclosures of Bank constitute the Deposit Agreement ("Agreement") between individual(s) or entity(ies) named hereon ("Depositor") and the Bank." *Id.* at 2. Fifth Third has also represented that its Rules and Regulations state, *inter alia*:

> In the case of overdraft or overpayment of any account, whether such by error, mistake, inadvertence, or otherwise, the amount of such overdraft shall immediately be paid to [Fifth Third]. An overdraft fee may be assessed by [Fifth Third] whether [Fifth Third] pays the item or not. If multiple items are presented to [Fifth Third] and there are not sufficient collected funds to pay all of those items, [Fifth Third] (not customer) has the right to decide the order of the items

13

> that will be paid and which items will be returned, if any. [Fifth Third] may select any payment order at any time, which may include paying the largest items first such as your mortgage, rent or car payment.

*Id.* at 2.

Plaintiffs oppose this argument. However, some courts have endorsed similar arguments when made by bank defendants in cases where the plaintiff was alleging that the defendant bank's re-sequencing practices were unlawful. Most notably, in *Hassler v. Sovereign Bank*, 374 Fed. App'x 341 (3d Cir. 2010), where a New Jersey plaintiff alleged that the defendant bank's practice of re-sequencing debit card transactions from highest-to-lowest amount was unlawful, the Third Circuit affirmed the dismissal of the plaintiff's breach of contract for violation of the duty of good faith and fair dealing, consumer fraud, and unjust enrichment claims based on its determination that the account agreement at issue, which Fifth Third has argued is similar to the language of the Deposit Agreement, allowed the defendant bank to reorder overdraft fees and "explicitly provided for the reordering of charges." *Id.* at 344; *see also Fetter v. Wells Fargo Bank, N.A.*, 110 S.W.3d 683 (Tex. App. Ct. 2003) (affirming dismissal of breach of implied duty of good faith and fair dealing claim because the deposit agreement "specifically permit[ted] high to low posting in addition to the authorization provided in UCC section 4.303(b)"); *Daniels v. PNC Bank, N.A.*, 738 N.E.2d 447 (Ohio Ct. App. 2000) (dismissing breach of implied duty of good faith and fair dealing claim because the deposit agreement that authorized the defendant bank to post items "in any order convenient to [the bank]" authorized the bank to post items from highest-to-lowest); *Smith v. First Union Nat'l Bank*, 958 S.W.2d 113 (Tenn. Ct. App. 1997).

Fifth Third also would likely argue that law authorized it to re-sequence Debit Card Transactions from highest to lowest amount. In its Memorandum in Support of its Motion to Dismiss, Fifth Third relied on an Illinois decision issued in a case where the plaintiff alleged that

a bank's practice of reordering checking transactions was unlawful. *See Hill v. St. Paul Fed. Bank for Savings*, 329 Ill. App. 3d 705, 768 N.E.2d 322, 328 (2002). Although Plaintiffs believe *Hill* and other cases like it relating to the re-sequencing of checks to be distinguishable from this matter, where Plaintiffs' claims relate to Fifth Third's re-sequencing of Debit Card Transactions, Plaintiffs acknowledge that substantial and complex briefing regarding the effects, if any, that federal and/or state law have on Plaintiffs' claims would be required were this litigation to proceed absent settlement.

With regard to Plaintiffs' unjust enrichment claims, in addition to the foregoing arguments, Fifth Third would likely argue that such claims are barred because Fifth Third's relationship with each Settlement Class Member was governed by the express terms of the Deposit Agreement. Although some exceptions exist, each of twelve states in which Fifth Third has offices recognizes that a cause of action for unjust enrichment does not lie when an express contract governs the relationship between parties. *See* Unjust Enrichment Chart, attached hereto as Exhibit D. Thus, it is reasonable to conclude that this issue would necessitate briefing and review, further complicating this matter absent settlement.

Plaintiff Willard alleges a claim of unconscionability.[8] In the Overdraft MDL, the bank defendants argued that unconscionability is not an independent cause of action, but rather, is a defense that can be used to prevent the enforcement of certain contractual terms. *See Cowin Equip. Co., Inc. v. Gen. Motors Corp*. 734 F.2d 1581, 1582 (11th Cir. 1984) ("[T]he equitable theory of unconscionability has never been utilized to allow for the affirmative recovery of money damages. The Court finds that neither the common law of Florida, nor that of any other state, empowers a court addressing allegations of unconscionability to do more than refuse

---

[8] Plaintiff Schulte does not allege a claim of unconscionability and, thus, the issue was not briefed in Fifth Third's Motion to Dismiss.

enforcement of the unconscionable section or sections of the contract so as to avoid an unconscionable result."). The court in the Overdraft MDL seemed to agree that unconscionability is not a substantive cause of action, but declined to dismiss such claims on other grounds. *In re Checking Acct. Overdraft Litig.*, MDL No. 2036, 2010 WL 841305, at **12-14 (S.D. Fla. Mar. 11, 2010). Similar briefing and review would likely be necessary in this matter absent settlement.

Arguments relating to the voluntary payment doctrine would also likely necessitate briefing and review. Generally speaking, the voluntary payment doctrine maintains that "[a]bsent fraud, coercion or mistake of fact, monies paid under a claim of right to payment but under a mistake of law are not recoverable." *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010) (referencing Illinois' interpretation of the voluntary payment doctrine). Each of the states where Fifth Third has offices recognizes a similar form of the voluntary payment doctrine. *See* Voluntary Payment Doctrine Chart, attached hereto as Exhibit E. As attested to in the Affidavit of Kevin Sullivan, Fifth Third estimates that approximately 72% of its overdraft fee revenue was generated from the approximately 7% of Fifth Third customers who overdrafted six or more times a month. Sullivan Aff. ¶ 10, attached as Exhibit 1 to Fifth Third Bank's Memorandum in Support of Final Approval. It is reasonable to believe that Fifth Third would argue that, at some point, such persons had actual or constructive notice of Fifth Third's practice of re-sequencing Debit Card Transactions, potentially rendering such Settlement Class Members' claims barred by the voluntary payment doctrine.

Further, absent settlement, Plaintiffs anticipate that Fifth Third would vigorously contest any motion seeking certification of a litigated class in this matter, and there is no guarantee that Plaintiffs would prevail at this stage. *Pella Corp. v. Saltzman*, 606 F.3d 391, 393 (7th Cir. 2010) ("Class treatment of consumer fraud cases can certainly present difficulties, and courts should

consider these concerns before deciding to grant class certification"). Additionally, any ruling on class certification would likely be appealed pursuant to Rule 23(f), further lengthening and complicating the matter.

If Fifth Third were to prevail on one or more of these arguments, a risk exists that the Settlement Class could receive little or no recovery. If, however, Plaintiffs were to prevail on their claims, Plaintiffs' expert estimates that Settlement Class Members incurred, at most, overdraft fees of approximately $97.7 million during the Class Period, as a result of Fifth Third's practice of re-sequencing Fifth Third Debit Card Transactions. Tarter Rep. at 15.[9] When determining the value of the litigation and comparing such value to the substantial benefits provided under the settlement, Plaintiffs submit that use of a significant discount percentage is appropriate in this case relating to persons incurring fees as a result of overdrawing their bank account, as it is reasonable to conclude that Settlement Class Members would place a premium on receiving payment today, rather than four, six, or even ten years from now, if ever, and the changes in Fifth Third's practices of processing Debit Card Transactions provided for by the settlement.

In contrast to these risks of continued litigation, the settlement offers a timely and substantial recovery to the Settlement Class. In addition to the $9.5 million Settlement Fund that Fifth Third has created under the settlement, Fifth Third has also expended over $416,000 in fulfilling its independent notice obligations under the settlement. Also, Fifth Third's agreement to cease its practice of re-sequencing Debit Card Transactions from the highest to lowest amount is an important and valuable benefit, because many Settlement Class Members will inevitably continue to bank with Fifth Third in the future. Plaintiff's expert has estimated the value of this

---

[9] This estimate includes overdraft charges that were not paid by Settlement Class Members and does not account for overdraft fees that were later waived, reversed, or refunded by Fifth Third. *See* Tarter Rep. at 12.

injunctive relief to be $58.8 million over the next five years, and $108.3 over the next ten years. Tarter Rep. at 16.[10]

Thus, a comparison of the strength of Plaintiffs' case with the benefits offered under the settlement supports that the settlement is fair, reasonable, and adequate.

### B. The Likely Complexity, Length, and Expense of Litigation

Prosecuting this litigation through trial and appeal would be lengthy and complex, and would impose significant costs on all parties. *See, e.g., In re Austrian and German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000) (recognizing that "[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them."). Continued proceedings would likely include substantial motion practice, continued fact discovery, class certification proceedings, dispositive motions, trial, and appeal. Because this litigation relates to the actions of Fifth Third, which has offices in twelve states, continued litigation would almost inevitably involve briefing regarding conflict and/or choice of law determinations, further complicating the matter. Moreover, given the nature of the conduct at issue, a battle of the experts at trial on the issue of damages is almost a

---

[10] Without taking into account the value of the injunctive relief provided for by the settlement and Fifth Third's obligation to independently pay certain costs related to notice and claims administration (which have amounted to over $416,000 to date), this amounts to a recovery of nearly 10%. Numerous courts have found that settlements amounting to less than 10% of damages to be fair, reasonable, adequate and worthy of approval. *See In re Ravisent Techs., Inc. Sec. Litig.*, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005) (approving settlement, which amounted to 12.2% of damages, and citing study by Columbia University Law School, which determined that "since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the class members' estimated losses.") (internal citations omitted); *In re Baan Co. Sec. Litig.*, 284 F. Supp. 2d 62, 66 (D.D.C. 2003) ("Courts have not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable; but an agreement that secures roughly six to twelve percent of a potential trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness.") (internal citations omitted); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.*, 1994 WL 485803 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages of $44.4 million, which amounts to approximately 8%); *Cagan v. Anchor Sav. Bank FSB*, 1990 WL 73423, **12-13 (E.D.N.Y. May 22, 1990) (approving $2.3 million settlement over objections that "best possible recovery would be approximately $121 million[.]")

certainty, and continued proceedings would likely include substantial expert discovery and significant related motion practice.

The settlement, in contrast, delivers a real and substantial remedy, which fairly, reasonably, and adequately addresses the situation confronting the members of the Settlement Class without the risk or delay inherent in prosecuting this matter through trial and appeal. Thus, this factor favors approval of the settlement. *See, e.g., Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation."); *In re Sunrise Sec. Litig.,* 131 F.R.D. 450, 455 (E.D. Pa. 1990) (approving a class action settlement because, in part, the settlement "will alleviate . . . the extraordinary complexity, expense and likely duration of this litigation").

### C. The Amount of Opposition to the Settlement

As detailed *supra*, more than 4,137,612 potential Settlement Class Members were mailed individual notice of the settlement. After this substantial notice effort, only eleven objections[11] were submitted on behalf of thirteen objectors. Three of the objections have nothing to do with the settlement. Also, only 342 opt outs were submitted. As detailed *infra* at Section IV, none of the objections submitted have any merit. Additionally, as of March 7, 2011, the Claims Administrator had received 78,786 claims.

---

[11] Plaintiffs have liberally construed the submissions as such. Since some responses from Settlement Class Members do not specifically state that they object to the settlement, a fair reading of these responses could further decrease the number. The Court's Preliminary Approval Order states that all objections to the settlement must be filed with the Court. Preliminary Approval Order, at 13-14. The Kelly, Cannata, and Ackerson Objections were not filed with the Court and, thus, are invalid. However, in the interest of carrying out the intentions of these supposed objectors, Plaintiffs have attached these alleged Objections hereto as Group Exhibit I. For the sake of completeness, Plaintiffs address these objections and statements from Settlement Class Members herein, without waiver of their invalidity pursuant to the Orders of the Court.

The miniscule number of objections received supports approval of the settlement. *See*, *e.g.*, *Shlensky v. Dorsey*, 574 F.2d 131, 148 (3d Cir. 1978) (stating that "[o]ne of the factors to be considered in determining the fairness of a settlement disposing of a class action is the reaction of the members of the class," and noting that the overwhelming majority of class members did not object to settlement); *Reynolds v. Nat'l Football League*, 584 F.2d 280 (8th Cir. 1978) (affirming approval of settlement agreement and noting that 15 objectors out of 1400 active players and one objector out of 4300 retired players did not indicate any substantial dissatisfaction with the settlement agreement); *In re SmithKline B*eecham Corp. Sec. Litig.*, 751 F. Supp. 525, 530 (E.D. Pa. 1990) (approving class action settlement and stating that "the reaction of the class to the proffered settlement is perhaps the most significant factor to be weighed in considering its adequacy, particularly when the relief is expressed in monetary terms" and that "the utter absence of objections and the nominal number of shareholders who have exercised their right to opt out of this litigation militate strongly in favor of approval of the settlement.")

Thus, Settlement Class Member's reaction to the settlement has been overwhelmingly positive and this factor favors approval of the settlement.

**D.     The Opinion of Competent Counsel**

The opinion of competent counsel is a factor to be considered by the Court in determining whether the settlement is fair, reasonable, and adequate. *Isby*, 75 F.3d at 1200. Each of Settlement Class Counsel has extensive backgrounds in consumer class actions and complex litigation and is of the opinion that the settlement is an excellent one, readily satisfying the standard of being fair, reasonable, and adequate. Thus, this factor weighs in favor of the settlement's approval.

### E. The Amount of Discovery Completed at the Time of Settlement

Settlement Class Counsel are highly experienced in consumer class actions, engaged in significant discovery prior to entering into the Settlement Agreement and were well apprised of the facts and law relating to this case when entering into such agreement.

"That the parties conducted their investigation through informal discovery, or based on information assembled in a related case, is not unusual or problematic, so long as they and the court have adequate information in order to evaluate the parties' relative positions." *IUE-CWA v. General Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) (citations omitted); *D'Amato v. Deutsche Bank,* 236 F.3d 78, 87 (2d Cir. 2001) (same).

During months of arms-length negotiations occurring prior to settlement, Settlement Class Counsel engaged in substantial informal discovery. *See* Manual for Complex Litigation (Fourth) at § 11.423 (2004) (noting that informal discovery is a recognized method of minimizing the cost, delay, and burden associated with formal discovery). Settlement Class Counsel had multiple meetings and conversations with Fifth Third's counsel, during which information was appropriately shared, as is the case not only in class actions but in other litigation as well, where counsel explore and advance early resolution, as all counsel should. Settlement Class Counsel also conducted a great deal of independent research, which included: reviewing public filings with the Securities and Exchange Commission, FDIC and other industry and consumer reports, payment system studies, asset evaluation studies, Congressional reports, and news stories; examining hundreds of pages of bank statements to study the manner in which Fifth Third's practices affected Settlement Class Members; and investigating case law regarding overdraft fees, banking regulations, other banks' practices, and relevant settlements. In April 2010, Plaintiff Schulte and Fifth Third exchanged initial disclosures pursuant to Rule 26(a).

Additionally, as provided for by the settlement, Settlement Class Counsel engaged in a substantial confirmatory discovery process which confirmed to them that the settlement readily meets the standard of being fair, reasonable, and adequate. Settlement Agreement ¶ 37; *see also* Section I.C., *supra*.

## III. Objections to the Settlement

### A. Objectors Represented By Counsel

#### 1. Objectors Represented by Members of the PEC

Members of the Plaintiffs' Executive Committee ("PEC") in the Overdraft MDL submitted objections on behalf of the Keyes Objectors and Objector Kannapel. The objections are lawyer driven, as these counsel have consistently sought transfer of the Actions to the Overdraft MDL so that they may control this litigation. In their own words, "the concerns raised by the [Keyes Objectors and Objector Kannapel] have nothing to do with the Objectors personal knowledge, experience, or opinion." Joint Motion for Protective Order, at 8 (Mar. 7, 2011) [D.E. #98]. This is not the only case where members of the PEC have engaged in such tactics, as certain members of the PEC recently attempted to wreck settlements in at least two other cases relating to a bank's re-sequencing of debit card transactions.[12] In both instances, the objections were denied.[13] Notably, no compensation has been delivered to any class member the PEC represents as a result of their efforts to date, and the press is already reporting in-fighting over fees relating to overdraft fee cases that are not even close to final.[14] Nevertheless, the PEC lawyers stand here to obstruct a settlement that has been preliminarily approved and would

---

[12] *See* Matos Objection, *Trombley v. National City Bank*, No. 10-cv-00232 (Aug. 13, 2010) [D.E. #11]; Appellant's Opening Brief, *Petrus v. Closson and Bank of America*, A.125963 *et al*. (Cal. App. Ct. Feb. 8, 2010), attached as Exhibit A to the Declaration of Barry R. Himmelstein [D.E. #39-1].

[13] *Trombley v. Nat'l City Bank*, No. 10-cv-00232, 2011 WL 87235 (D.D.C. Jan. 11, 2011) (granting preliminary approval of class action settlement); Order Finally Approving Class Action Settlement, *Closson v. Bank of America N.A.*, No. CGC 04436877 (Cal. Super. Ct. Aug. 3, 2009).

[14] The Recorder, Ex-Lieff Partner Says Strategy Feud is Behind Ouster, p.2 (March, 3, 2010), attached hereto as Exhibit G.

22

deliver timely and significant benefits to Settlement Class Members. In any event, the objections submitted by members of the PEC find little basis in fact or law.

### a) No Analysis of the Claims at Issue in this Litigation

The Keyes Objectors and Objector Kannapel acknowledge that a comparison of the law and facts of this case with the value of the settlement is the primary factor in determining whether a settlement is fair, reasonable, and adequate. The Keyes Objectors and Objector Kannapel, however, include no analysis of the claims at issue in this litigation or recognition of the substantial benefits that the settlement makes available to Settlement Class Members. Instead, their objections rely on: (1) an opinion from the Northern District of California that is readily distinguishable from this litigation and now on appeal to the Ninth Circuit, *Guitierrez v. Wells Fargo Bank*, 730 F. Supp. 2d 1080 (N.D. Cal. Aug. 10, 2010); and (2) an alleged undisclosed memorandum of understanding with Bank of America, the terms of which to this date remain a mystery as they have yet to be finalized or made public, and the details, or lack thereof, remain with the objectors' counsel using it here without full disclosure of the details of the settlement.

The *Gutierrez* decision was the subject of significant briefing at the preliminary approval stage in this matter, and does not detract from the settlement's fairness, reasonableness, and adequacy.[15] First, this settlement was reached before the decision in that case, and must be evaluated on that basis: "[A] class action settlement is to be evaluated according to the state of the law as of the time it was presented to the district court for approval." *Armstrong v. Bd. of Sch. Directors of City of Milwaukee*, 616 F.2d 305, 322 (7th Cir. 1980), *overruled on other grounds, Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) (citing *Dawson v. Pastrick*, 600 F.2d

---

[15] *See* Plaintiffs' Response to Notice of Recent Development (Aug. 19, 2010) [D.E. #54]; Fifth Third Bank's Response to Notice of Recent Development (Aug. 30, 2010) [D.E. #57].

70, 76 (7th Cir. 1979)). Second, the law at issue in *Gutierrez* was different than that at issue here, rendering the decision of little value to any assessment of the fairness of the settlement. There, the plaintiffs prevailed on claims brought under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*., pursuant to which relief is available without individualized proof of deception, reliance, and injury. *In re Tobacco II Cases*, 207 P.3d 23, 39 (Cal. 2009). No comparable statute or claim is at issue in this litigation, and the Keyes Objectors' assertion that the claims at issue in *Gutierrez* "are substantially similar to those raise in this case" is wrong. Keys Obj. at 6. Third, the opinion is currently on appeal to the Ninth Circuit Court of Appeals, rendering its validity questionable. *See* Keyes Obj. at 5 (arguing that it would be improper for the Court to rely on the *Closson* settlement because it is currently on appeal).

The Keyes Objectors' and Objector Kannapel's failure to disclose the specifics of any alleged agreement with Bank of America renders any references to such agreement of little value to any determination of the fairness of the settlement. No Bank of America settlement is on file in the Overdraft MDL and, little information regarding any alleged agreement is publicly available, including, *inter alia*: the length of the class period, nature of claims resolved, scope of claims release, amount of benefits provided to class members, method of allocation, whether and what type of a claims process will be used, and the limitations placed on that settlement by the *Closson* settlement. Although a Notice of Settlement was filed in the Overdraft MDL on February 4, 2011, itself a peculiar if not convenient filing, stating that the plaintiffs in that matter and Bank of America had "executed a Memorandum of Understanding evidencing an agreement in principle," the Keyes Objectors and Objector Kannapel, and their counsel, have failed to disclose the details of any such agreement to this Court or, for that matter, to any other court so far as Settlement Class Counsel are aware. *See* Keyes Objection: Exhibit A [D.E. #90-1]. At the

very least, the uncertainty and ambiguity surrounding the alleged agreement render it of little

value to any evaluation of the settlement here.

Without further specificity regarding the terms of the alleged agreement, the existence of

the *Closson* settlement raises significant concerns. The Keyes Objectors' characterization of

*Closson* as "a false advertising case, which challenged the truth of some limited, discrete

advertising describing [Bank of America's] posting practices" is misleading and wrong. Keyes

Obj. at 5. The settlement class in *Closson* was defined as follows:

> Any person who, at any time between December 6, 2000 and December 31, 2007,
> resides in the United States and had an account at Bank of America accessible
> through a Bank of America debit card, and either (i) paid at least one insufficient
> funds fee, overdraft fee, returned item fee, or similar fee, that was assessed to the
> person's account within five business days after a Bank of America debit card
> transaction either occurred or posted to the account, or (ii) paid at least one
> overlimit fee, or similar fee, that was assessed for an account cycle in which a
> Bank of America debit card transaction either occurred or posted to the person's
> account. ("Debit card" means debit card, check card or any other bank card used
> for debit purchases.)

Order, *Closson v. Bank of America N.A.*, No. CGC 04436877, at 2 (Cal. Super. Ct. Aug. 3, 2009)

[D.E. #35-9]. Thus, the claims at issue in *Closson* certainly related to and directly dealt with

Bank of America's practice of re-sequencing debit card transactions, not just false advertising.

The trial court granted final approval of the settlement over an objection submitted by certain

members of the PEC that asserted that the settlement class and release included in the settlement

were broader than the claims that were at issue in that litigation. *Id.* Those members of the PEC

filed an appeal to the trial court's order and the appeal remains pending. Absent reversal of the

trial court's opinion, the claims of *Closson* class members apparently would be released, barring

them from submitting claims for overdraft fees incurred as the result of Bank of America's re-

sequencing of debit card transactions from December 6, 2000 to December 31, 2007. *See* Bank

25

of America, 10-K (Feb. 25, 2011).[16] These facts draw into question exactly what persons would be eligible to submit claims under the alleged Bank of America agreement and whether the $410 million figure is simply window dressing, because seven years of overdrafts (which, in any event, certain members of the PEC valued at $18 billion) for 4.8 million Bank of America customers will be bound by the $35 million *Closson* settlement.[17]

### b) Evidence Relating to the Strength of Plaintiffs' Case

The Keyes Objectors' and Objector Kannapel's arguments that Plaintiffs have failed to present sufficient analysis or evidence of the strength of their cause, including the amount of potential damages, has no merit. Plaintiffs, in this filing, have included the very analysis and information they complain is missing, and that information is buttressed by Fifth Third's filing. As the Court recognized at the preliminary approval stage, Plaintiffs were not required to submit such information any earlier, and any implication or assertion to the contrary is incorrect. Preliminary Approval Order, at 4-5.

### c) The Amount of Discovery Engaged in at the Time of Settlement

As noted *supra*, Settlement Class Counsel engaged in substantial informal discovery and were well-apprised of the facts and law relating to this litigation when they entered into the

---

[16] The 10-K states, in relevant part, "[i]f the *Closson* settlement is affirmed, it will likely bar the claims of many of the putative class members in [the MDL complaints], as many of those same class members are covered by the putative class in *Closson* . . . The settlement also contemplates that a stay will be requested in the *Closson* appeal and that, when this settlement becomes effective, the appeal in *Closson* will be withdrawn and the settlement in *Closson* will be effectuated according to its terms." These very terms were subject to the PEC's objections on appeal *See* n. 15, *infra.*

[17] As certain members of the PEC, and other objectors noted in objecting to the *Closson* settlement, with a mere 2% response rate and claims capped at $78, "the total sum given to the class of 4.8 million people is $8.5 million, i.e., $78 dollars times the 109,028 claimants. Of the remaining $26.5 million, $8.125 million went to fees, approximately $1.5 million to notice and administration expenses, leaving $16.8 million ([or twice the class' recovery]) to a cy pres fund." *See Petrus v. Closson*, No. A125963, Br. of Appellant Gossett, 2009 WL 5191159, at *18-19 (Cal. App. Dec. 21, 2009).

Settlement Agreement. Additionally, they engaged in a substantial confirmatory discovery process, which confirmed that the settlement is fair, reasonable, and adequate.

The Keyes Objectors' argument that any settlement negotiated prior to formal discovery occurring is *per se* unfair is in direct contraction with the Court's instruction: "that counsel conducted no formal discovery prior to settlement does not necessarily preclude eventual final approval of the proposed settlement." Preliminary Approval Order, at 8 (citations omitted). Additionally, the Federal Rules of Civil Procedure require that parties consider "the possibilities for promptly settling or resolving the case" and "make or arrange for the disclosures required by Rule 26(a)(1)" at an initial discovery conference. Fed. R. Civ. P. 26(f). The exchange of initial disclosures begins the formal discovery process in civil actions filed in federal court and, thus, in almost all cases, parties are required to discuss settlement prior to engaging in any formal discovery. Additionally, from a practical standpoint, such a blanket rule would lead to absurd results, as it would necessitate the unnecessary expenditure of substantial resources in cases such as this, where the facts are generally not in dispute, and both parties are willing to work together in pursuit of resolution.

The Keyes Objectors' statement that Settlement Class Counsel previously refused to disclose whether any pre-settlement discovery had been conducted is false. Keys Obj. n.6. On the conference call referenced, Mr. Gilbert asserted that no discovery had been conducted prior to settlement, but was repeatedly corrected that substantial informal discovery had occurred prior to reaching settlement.

### d)      The Settlement Allocation

The allocation of Settlement Class Member benefits under the settlement is appropriately tailored to the facts and law at issue in this case, and is fair, adequate, and reasonable. "Courts

have routinely approved plans of allocation that provide different payments to class members." *In re Lucent Techs., Inc., Secs. Litig.*, 307 F. Supp. 2d 633, 649 (D.N.J. 2004) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 248-49 (3d Cir. 2001)); *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997) ("[W]hen real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weight the distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed.") (internal citations and quotations omitted).

Pursuant to the settlement, Settlement Class Members are entitled to receive reimbursement of claimed Overdraft Fees incurred during a single 45-day period. This allocation method ensures that the benefits of the settlement are made available to all Settlement Class Members, while protecting the interests Settlement Class Members with the strongest claims, those who incurred "surprise" overdraft charges, from erosion of the Settlement Fund by Settlement Class Members who were chronic overdrafters, and therefore those with arguably the weakest claims. A significant percentage of the Overdraft Fees incurred relating to Fifth Third Debit Card Transactions were charged to Settlement Class Members who were chronic overdrafters. Sullivan Affidavit ¶ 10 (noting that Fifth Third's overdraft data shows that approximately 72% of all overdraft fee revenue was generated from the approximately 7% of Fifth Third's customers who overdrafted six or more times a month). These frequent overdrafters arguably have weaker claims than the other members of the Settlement Class. Indeed, as the Court recognized in its Preliminary Approval Order: "[r]eimbursing [Settlement Class Members] for charges incurred during a single 45-day period allows members to recoup these 'surprise' charges. Conversely, 'chronic overdrafters' can be said to have had actual or constructive notice of Fifth Third's reordering policies, and accordingly have arguably weaker claims." Preliminary

Approval Order at 7. In *Trombley v. National City Bank*, a class action where a plaintiff alleged that a bank's re-sequencing of debit/check card and ATM transactions was unlawful, the court reached a similar conclusion when granting preliminary approval of a settlement that allowed class members to file claims for reimbursement of overdraft fees incurred during any two months of the class period at issue there, in stating that:

> Reimbursing for the highest amount of overdraft fees incurred in any two calendar months-the two months do not have to be consecutive-enables Class Members to receive compensation, even though they may have had reasonable notice of the manner in which overdraft fee charges are imposed. There is also no cap on the number of overdraft fees that Class Members may recover for the two calendar months that they select for reimbursement. Limiting the recovery period to two months also prevents chronic overdrafters, who had notice of National City Bank's overdraft policies yet continued incurring overdraft fees anyway, from being unfairly rewarded for their behavior. It appears to be, therefore, a reasonable allocation methodology for the settlement funds, with the remaining funds then distributed among Class Members on a pro rata basis.

No. 10-cv-00232, 2011 WL 87235, *6 (D.D.C. Jan. 11, 2011). Thus, the allocation method provided for under the settlement takes is tailored to the facts of this case and is fair, reasonable, and adequate.

Plaintiffs take issue with the Keyes Objectors statement that the Court may have inadvertently conflated "the question of customers' surprise concerning the assessment of overdraft charges generally, with customers' surprise concerning that bank's concealed manipulation of their transactions—*i.e.*, the re-sequencing their transactions from high-to-low—to artificially increase the number of overdraft charges assessed in a given day." This statement makes little sense and, in any event, the Court was well-informed of the facts and law of this case when it entered its Preliminary Approval Order.

### e) The Claims Process

The Keyes Objectors' and Objector Kannapel's assertion that the claims process unduly burdens Settlement Class Members is conclusively rebutted by applicable law and Settlement Class Members' response to the settlement.

As the Court recognized in its Preliminary Approval Order, the use of a claims process to effectuate a class action settlement is common practice. Preliminary Approval Order at 8. Settlement Class Members' response to the settlement has been excellent, as the Claims Administrator had received 78,786 claims as of March 7, 2011, especially considering that Settlement Class Members have until May 2, 2011, to submit claims. This excellent response conclusively rebuts the Keyes Objectors' and Objector Kannapel's assertion that the claims process was unduly burdensome. Plaintiffs submit that the Keyes Objectors' comparison of the claims process here to a settlement where only a few thousand claims were submitted illustrates either a miscalculation or misunderstanding of the fair, reasonable, and adequate claims process at issue here by the Keyes Objectors.

Also, in response to a concern raised by the Court in its Preliminary Approval Order, the claims process here was revised to allow Settlement Class Members to submit claims based on the best of their knowledge and belief, subject to Fifth Third's right to verify such claims, undoubtedly aided in making the benefits of the settlement available to Settlement Class Members. The Keyes Objectors' argument that such procedure is somehow unfair is illogical and wrong.

Moreover, the settlement's providing that upon request Fifth Third shall provide Settlement Class Members with 16 months worth of statements free-of-charge from the date of such request is also fair, reasonable, and adequate. This term was the subject of negotiations

between the Settling Parties and was agreed to in furtherance of resolution. Also, the settlement provided that if Settlement Class Members were unable to locate their statements, they could submit a Claim Form based on the best of their knowledge and belief. The Keyes Objectors' and Objector Kannapel's statements that the settlement should have made available all statements from the Class Period are "tantamount to complaining that the settlement should be 'better,' which is not a valid objection." *Browning v. Yahoo Inc*., No. C04-01463, 2007 WL 4105971, *5 (N.D. Cal. Nov. 16, 2007) (citing *Hanlon v. Chrysler Corp*., 150 F.3d 1011, 1027 (9th Cir. 1998)).

### f)     The Scheduling of the Final Fairness Hearing

The Court already addressed and rejected the Keyes Objectors' claim that the final fairness hearing should be scheduled after the deadline set for Settlement Class Members to submit claims. Order [D.E. #68]. Thus, the Keyes Objectors' repeat of such argument is without merit.

### 2.     The Katz Objection

Objector Katz argues that the proposed monetary settlement is "far too small." As discussed *supra*, given the real risks of litigation and the real and timely benefits provided through refunds and injunctive relief, the settlement is anything but "too small." The only authority Objector Katz relies on is an Order from the Overdraft MDL, wherein the court denied an omnibus motion to dismiss. That Order relates only to whether the plaintiffs adequately pleaded causes of action and does not specifically analyze any of the specific laws at issue in this litigation, rendering it of little value when assessing the settlement. *See In re Checking Acct. Overdraft Litig.*, MDL No. 2036, 2010 WL 841305, at *8  (S.D. Fla. Mar. 11, 2010) ("Any arguments regarding specific Plaintiffs or specific states may be raised at a later stage upon

Court consideration of class certification, summary judgment, or trial."). Additionally, Objector Katz relies upon an incorrect understanding of the amount of overdraft fees at issue in this litigation (he says $400 million) and disregards applicable law.

Further, as noted *supra*, Objector Katz's assertion that Fifth Third should have been obligated to provide Settlement Class Members with more than 16 months worth of account statements is not a valid basis for an objection as it simply seeks "more," and, in any event, this settlement provision is fair, reasonable, and adequate. *Cf. Browning*, *supra*.

**B.    The *Pro Se* Objections**

Eight *pro se* objections to the settlement were submitted. Three of these objections do not relate to the settlement.[18] Collectively, the five other *pro se* objections assert: (1) that limiting Settlement Class Members claims to a single 45-day period is too restrictive; (2) that Fifth Third should provide more than 16 months of statements free-of-charge; (3) that the Class Period should be extended; (4) that the amount of attorneys' fees sought are excessive; and (5) miscellaneous reasons. In summary, most of these objectors believe that the settlement should be a little different to comport with his or her individual situation and asking for more. The settlement was the product of negotiations that involved both sides compromising in the interests of resolution and minimizing the risks attendant in further litigation. The alternative is to litigate the motion to dismiss, then confront summary judgment, then attempt class certification, etc., and, if successful at these stages, to go to trial—a reality that many lay objectors may not understand. Nor might they comprehend or appreciate the time delay and risks associated with such litigation. Notwithstanding, the settlement is an excellent one and the *pro se* objections lack merit.

---

[18] The objections of Objectors Basis, Kelly, and Stackel identify no reasons for objecting to the settlement.

Complaints that claims should not be limited to a single forty-five day period[19] and that Fifth Third should be obligated to provide Settlement Class Members with more than sixteen months worth of past statements free-of-charge,[20] are "tantamount to complaining that the settlement should be 'better,' which is not a valid objection." *Browning*, 2007 WL 4105971, at *5. As noted herein, the allocation procedures provided for under the settlement are fair, reasonable, and adequate. And, Fifth Third's agreeing to provide Settlement Class Members' with sixteen months worth of statements free-of-charge was also fair, reasonable, and adequate because the term was the subject of negotiations and Settlement Class Members were able to submit Claim Forms based on the best of their knowledge and belief if they were unable to locate their statements.

Objector Scyoc argues that the Class Period should include through December 31, 2010; another argument that the settlement should have been different. The length of the Class Period is appropriate and is tailored to the facts of this case, specifically, the effectuation of Regulation E, which provides:

> for accounts opened prior to July 1, 2010, financial institutions may not assess any fees or charges on customer accounts on or after August 15, 2010, for paying "an ATM or one-time debit card transaction pursuant to the institutions overdraft service," unless a customer affirmatively opts in to overdraft coverage, and

> for accounts opened after July 1, 2010, a financial institution must obtain a consumer's affirmative consent before assessing any fee or charge on a consumer's account for paying an "ATM or one-time debit card transaction pursuant to the institution's overdraft service."

12 C.F.R. § 205(c)(1), (2). Thus, the length of the Class Period is appropriately tailored to the facts of this case.

---

[19] Sycoc Objection; Ackerson Objection; Vitali Objection.
[20] Drew Objection; Sycoc Objection; Vitali Objection.

Objector Cannata objects to the amount of attorneys' fees being sought. On its face, the Cannata Objection is premised on two incorrect factual assumptions: (1) that Settlement Class Members' claims will not exhaust the Settlement Fund after Administrative Expenses are deducted; and (2) that Class Counsel justify the amount of attorneys' fees using the percentage of the fund method. As noted herein, Settlement Class Members reaction to the settlement was overwhelmingly positive, as the Claims Administrator had received 78,786 claims as of March 7, 2011, and it is likely, if not certain, that Settlement Class Members' claims will exhaust the Settlement Fund after Administrative Costs are paid. And, if the value of valid claims submitted by Settlement Class Members does not exhaust the remainder of the Settlement Fund, each Settlement Class Member's claim will be prorated up, not to exceed three times the amount of his or her claim, which will almost certainly exhaust the Settlement Fund. Moreover, as discussed *infra* at Section IV, is consistent with the market price for legal services at the initiation of the litigation. *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001)

Finally, Objector Ackerson objects to the settlement because it does not offer reimbursement of overdraft fees received from the re-sequencing of checks. The inclusion of such additional fees, however, would dilute the value of the settlement to Settlement Class Members, and would not be in the best interest of the Settlement Class.

## IV.   Attorneys' Fees, Costs, and Expenses

Settlement Class Counsel respectfully request that the Court approve payment from the Settlement Fund of attorneys' fees in the amount of $3,166,666 and costs and expenses of $54,281.32.  Fifth Third has agreed not to oppose Settlement Class Counsel's request for such awards, subject to Court-approval.

## A.    Attorneys' Fees

"[W]hen deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) (collecting cases). To do so, the Court "must estimate the terms of the contract that private plaintiffs would have negotiated with their lawyers, had bargaining occurred at the outset of the case (that is, when the risk of loss still existed)." *Id.* The Court should consider the following elements when conducting its analysis: attorneys' fee awards in other class action settlements; any fee agreements between the parties; the risk of nonpayment counsel agreed to bear; the quality of Settlement Class Counsel's performance; the amount of work necessary to resolve the litigation; and the stakes of the case. *Taubenfeld v. Aon Corp.,* 415 F.3d 597, 599 (7th Cir. 2005).

Consideration of these factors supports that Settlement Class Counsel's request for an award of attorneys' fees should be approved.

### 1.    Attorneys' Fee Awards in Other Cases

The Court should consider attorneys' fee awards in other class actions when assessing Plaintiffs' fee request. *Taubenfeld*, 415 F.3d at 601.

Settlement Class Counsel' request of $3,166,666 represents 33.3% of the Settlement Fund created under the settlement, which is consistent with other attorneys' fee awards approved in other class actions by courts in this circuit. *See Id.* (affirming district court's award of 30% of a $7.25 million settlement fund); *In re Synthroid Mktg. Litig.*, 325 F.3d 974 (7th Cir. 2003) (affirming the district court's award of 30% of the first $10 million to counsel representing the consumer class); *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (affirming district court's

award of 38% of a common fund); *see also Kirchoff v. Flynn*, 786 F.2d 320, 324 (7th Cir. 1986) (noting that the customary contingency fee ranges from 33 1/3% to 40% of the amount recovered).

Further, under the settlement, Fifth Third was obligated to perform and independently pay for a number of tasks related to Notice and Claims Administration, the costs of which will not be reimbursed from the Settlement Fund. Settlement Class Counsel has been informed that Fifth Third has incurred $416,000 in such costs, which represents an additional benefit to the Settlement Class. Settlement Class Counsel's requested award is reduced to slightly less than 32% when these benefits are taken into consideration.

These figures do not take into account the injunctive relief provided for under the settlement through which Fifth Third agreed to end its practice of re-sequencing Debit Card Transactions from the highest to lowest amount, which Plaintiffs' expert has valued to be a $58.8 million benefit over the next five years or a $108.3 million benefit over the next ten years. The injunctive relief in this case provides a significant benefit to the Class and that benefit should be taken into account when evaluating the full value of the settlement. The changes to the Bank's business practices inure to all of the Bank's customers, regardless of whether they file a claim. Furthermore, such changes directly remedy the practices which form the core of Plaintiffs' complaints. Indeed, other courts have found that obtaining such injunctive relief supports approval of a settlement. *See Meyenburg v. Exxon Mobil Corp.*, 2006 WL 5062697 (S.D. Ill. June 5, 2006) (injunctive relief valued at $75 million taken into account in approving settlement); *In Re Mexico Money Transfer Litig.,* 267 F.3d 743, 748 (7th Cir. 2001) (affirming class action settlement, compromised, in part, of injunctive relief which was "not an outcome to be sneered at"); *Isby,* 75 F.3d at 1199-2000 (affirming class action settlement compromised of

injunctive relief); *Linney v. Cellular Alaska P'ship*, 1997 WL 450064 (N.D. Cal. July 18, 1997), *aff'd*, 151 F.3d 1234 (9th Cir. 1998) (settlement approved where "experts retained by class counsel . . . estimated the value of [the injunctive relief] at between $20.9 million and $34.2 million" and court noted that the value of such injunctive relief was "no doubt substantial.")

Taking the injunctive relief in this case into consideration, the fee award requested represent less than 5% of the total benefit that the settlement brings to the class. Thus, this factors supports approval of the requested award.

### 2.    Agreements Between Plaintiffs and their Counsel

The Court should consider any actual agreement between the parties when assessing a fee request. *In re Synthroid Mktg. Litig.*, 264 F.3d at 718. Here, the client representation agreement between Plaintiff Schulte and her counsel states that "counsel may seek an award of up to 33 1/3 % of any recovery." Affidavit of Eugene J. Benick, III, ¶ 3, attached hereto as Exhibit F. This factor supports the reasonableness of Settlement Class Counsel's fee request here.

### 3.    The Risk of Nonpayment

At the outset of this litigation, Settlement Class Counsel agreed to represent Plaintiffs on a contingency basis knowing that there was a real possibility that they could litigate for years and then end up receiving no compensation for the time and effort they spent in furtherance of the matter. *See In re Transunion Corp. Priv. Litig.*, 629 F.3d 741, 746 (7th Cir. 2011) (stating that "within the set of colorable legal claims, a higher risk of loss does argue for a higher fee"); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 54 (2d Cir. 2000) ("[A]ttorneys' risk is perhaps the foremost factor in determining an appropriate fee award.") (citation and quotation omitted); *Jones v. Diamond,* 636 F.2d 1364, 1382 (5th Cir. 1981) ("Lawyers who are to be compensated

only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result.").

As detailed herein, if this matter were litigated to conclusion, Plaintiffs' claims would be subject to a number of specific defenses and there is no guarantee that Plaintiffs would prevail at the class certification stage. Additionally, at the time of the filing of the Actions, it could reasonably be concluded that the judicial landscape was not favorable to Plaintiffs' claims, as the district court's opinion in *Hassler v. Sovereign Bank*, later upheld by the Third Circuit Court of Appeals during the pendency of this litigation, dismissing a plaintiff's claims against a defendant bank relating to the bank's reordering of debit card transactions was on file. 644 F. Supp. 2d 509 (D.N.J. 2009), *aff'd* 374 Fed. App'x 341 (3d Cir. 2010).

There was no evidence that Fifth Third had any interest in settling at the initiation of the litigation. In a recently published article, Barry Himmelstein, who is counsel for the Keyes Objectors and one of lead counsel in the Overdraft MDL, is quoted as stating that "the banks had all refused to even mediate until [the *Gutierrez* Judgment] came down." The Recorder, Ex-Lieff Partner Says Strategy Feud is Behind Ouster, p.2 (March, 3, 2010), attached hereto as Exhibit G. The *Gutierrez* decision was entered on August 10, 2010, well after the initiation of the Actions, which supports that the possibility of settlement was at best uncertain at the outset of this matter.

### 4. The Quality of Settlement Class Counsel's Performance

The timely and substantial benefits made available to Settlement Class Members under the settlement evidences that Settlement Class Counsel's performance was excellent in this litigation. Settlement Class Counsel's goal at the outset of this litigation was to achieve a substantial recovery for Settlement Class Members when compared to the facts and law at issue in this litigation, and to stop Fifth Third from continuing to harm Settlement Class Members

through re-sequencing Debit Card Transactions from highest-to-lowest amount. The settlement accomplished these goals in full, by making available a substantial Settlement Fund of $9,500,000 from which Settlement Class Members may receive reimbursement of Overdraft Fees and by ending Fifth Third's re-sequencing of Debit Card Transactions from highest to lowest amount. These significant benefits were negotiated in a timely manner, further enhancing the value of the settlement to Settlement Class Members. *See Donovan v. Estate of Frank E. Fitzsimmons*, 778 F.2d 298, 309 n.3 (7th Cir. 1985) (a $2 million settlement sum today is worth the same as a $3.6 million recovery five years from now, at a prime interest rate of 12.5%). Thus, this factor favors approval of the requested award.

### 5.    The Amount of Work Necessary to Resolve this Litigation

As detailed herein, at the initiation of this case, it was likely that resolving this matter would necessitate years of discovery, briefing, argument, trial, and appeals, which would require thousands, if not tens of thousands, of hours of attorney time to complete. As of March 4, 2011, Settlement Class Counsel and other attorneys from their firms reported having spent 2815.50 hours advancing the matter, which represents a lodestar of $1,258,385.20. *See* Summary of Attorney Time, attached to the Affidavit of Sharon A. Harris.[21] Thus, the requested award represents a modest multiplier of less than 2.52 without taking into account the value of the injunctive relief provided for by the settlement or the expenses Fifth Third incurred relating to notice and claims administration that will not be reimbursed from the Settlement Fund. This multiplier will necessarily be reduced by the time Settlement Class Counsel will spend preparing for, traveling to, and appearing at the Final Fairness Hearing of this matter, in overseeing claims administration, and in resolving any appeals. Accordingly, this factor favors approval of the requested awards.

---

[21] The Affidavit of Sharon A. Harris is attached hereto as Exhibit H.

### 6. The Stakes of this Litigation

The stakes of this case were uncertain at its initiation. As detailed herein, Plaintiffs' and the other Settlement Class Members claims are subject to a number of defenses and a real possibility existed that the Court would decline to certify any class. Also, because Fifth Third has offices in twelve states, in the event the Court were to certify a class or classes, the possibility existed that such class or classes could be limited to one or a few states where Fifth Third has an office. The stakes of the case were also difficult to quantify due to the fact that a large portion of overdraft fees incurred are charged to a small number of "chronic overdrafters," who could potentially be subject to a number of unique defenses. Accordingly, the uncertain stakes of this litigation at its outset supports approval of the requested award.

### B. Reasonable Costs and Expenses

When analyzing a request for an award of costs and expenses the Court should apply a market-based approach. *In re Synthroid Mktg. Litig.*, 264 F.3d at 722. Settlement Class Counsel respectfully request that they be reimbursed for $54,281.32 costs and expenses incurred in furtherance of this matter. *See* Affidavit of Sharon A. Harris, attached hereto as Exhibit H. These costs and expenses were incurred in furtherance of the litigation for filing fees, PACER fees, court reporter fees, transcript fees, postage and messenger delivery charges, photocopies, traveling, facsimile and telephone charges, and expert fees. Settlement Class Counsel have not included costs and expenses incurred for electronic legal research related to this litigation in the request. Plaintiffs submit that, in addition to being eminently reasonable, the requested costs and expenses are consistent with what the market would award in a private setting.

## V.   Incentive Awards

Plaintiff incentive awards serve to encourage members of a class to become class representatives and to reward individual efforts taken on behalf of a class. *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (awarding incentive award of $25,000). "In deciding whether such an award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation."

Here, Representative Plaintiffs' participation and willingness to undertake the responsibilities and risks attendant with bringing this class action warrant that they be awarded the proposed individual incentive awards of $1000 each.

## CONCLUSION

As the above analysis shows, the settlement is fair, reasonable, and adequate, and satisfies the standard for final approval. Therefore, Representative Plaintiffs, individually and on behalf of the Settlement Class, by and through Settlement Class Counsel, pray that this Honorable Court enter an order:

(a) finding that the Settlement Agreement is fair, reasonable, and adequate, and in the best interest of the Settlement Class, and granting final approval to the settlement;

(b) granting Representative Plaintiffs' request for attorneys' fees in the amount of $3,166,666; reasonable costs and expenses in the amount of $54,281.32; and incentive awards for Representative Plaintiffs in the amount of $1000 each;

(c) denying each of the objections as being without merit; and

(d) granting such other and additional relief as the Court may deem just and appropriate.

Dated: March 7, 2011

Respectfully submitted,

___/s/ Ben Barnow_____

Ben Barnow
**Barnow and Associates, P.C.**
1 North LaSalle, Suite 4600
Chicago, IL  60602
(312) 621-2000

Burton H. Finkelstein
**Finkelstein Thompson LLP**
The Duvall Foundry
1050 30th Street, N.W.
Washington, D.C. 20007
(202) 337-8000

Hassan A. Zavareei
**Tycko & Zavareei LLP**
Suite 808
2000 L Street, N.W.
Washington, D.C. 20036
(202) 973-0900

David James Worley
**Evangelista & Associates, LLC**
One Glenlake Parkway
Suite 700
Atlanta, GA 30328
404-478-7195

*Settlement Class Counsel*

<u>List of Exhibits</u>

Settlement Agreement ..................................................................................................................... A

The Expert Report of Mr. Thomas Tarter ....................................................................................... B

Affidavit of Cameron R. Azari, Esq., on Implementation and Adequacy of Settlement Notice
Program ........................................................................................................................................... C

Unjust Enrichment Chart ................................................................................................................ D

Voluntary Payment Doctrine Chart ................................................................................................. E

Affidavit of Eugene Benick ............................................................................................................ F

The Recorder, Ex-Lieff Partner Says Strategy Feud is Behind Ouster, p.2 (March, 3, 2010) ....... G

Affidavit of Sharon A. Harris ......................................................................................................... H

Objections Not Filed With the Court ...................................................................... Group Exhibit I